**Ritchie BENNETT**

v.

**NISSAN NORTH AMERICA, INC.**

Court of Appeals of Tennessee,
at Nashville.

Nov. 12, 2008 Session.

March 27, 2009.

Permission to Appeal Denied by
Supreme Court Nov. 23, 2009.

William J. Butler, Lafayette, Tennessee, for the appellant, Ritchie Bennett.

Keith D. Frazier, Nashville, Tennessee, for the appellee, Nissan North America, Inc.

## OPINION

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and ANDY D. BENNETT, J., joined.

Employee was placed on leave and not allowed to return to work as a production technician for an automobile manufacturer based on an individual holistic medical evaluation conducted at the request of Employer following Employee's recovery from a work-related injury and subsequent surgery. Employee filed suit against Employer alleging Employer's failure to return Employee to work constituted a discriminatory action in the terms and condition of his employment due to Employee's physical handicap in violation of the Tennessee Handicap Act ("THA") and the Tennessee Human Rights Act ("THRA"). While the case was pending Employee accepted a voluntary termination that was offered to all employees. The trial court granted summary judgment for Employer finding Employee was not a "qualified" individual with a "disability" or regarded as such by Employer as required by the statute. We have determined that the trial court erred in granting summary judgment on the ground that Employee did not meet the statutory definition of "disabled." We have determined, however, that summary judgment on the ground that Employee was not a "qualified" individual for the position, as required by Tennessee anti-discrimination laws, was proper. Accordingly, we affirm the trial court's grant of summary judgment, as modified.

## I. Background

The Appellant, Mr. Bennett, began his employment with the Appellee, Nissan North America, Inc. ("Nissan"), in July 1992, as a production technician. Over the course of his employment with Nissan he performed tasks in a variety of "zones," but was at all times an automotive manufacturing production technician. Mr. Bennett sustained his first work-related injury in December 1992, and over the next twelve years Mr. Bennett sustained another eleven work-related injuries including low back strain, left lower leg contusion, left knee strain, right shoulder strain/neck pain, bilateral knee contusion, bilateral wrist strain, right shoulder strain, and left and right carpal tunnel syndrome. As a result of these various injuries, Mr. Bennett underwent five surgeries of increasing severity between March 1997 and January 2005, including surgery for both the left and right carpal tunnel syndrome, surgery for a right shoulder injury, and two surgeries on his neck.[1]

Prior to Mr. Bennett's last surgery he complained of chronic neck pain, pain and numbness in his left arm, and weakness in his triceps and was diagnosed with cervical radicular syndrome, cervical disc herniation and cervical degenerative disc. On

---

1. Nissan settled two worker's compensation claims filed by Mr. Bennett as a result of these injuries; the first in 1999, as a result of Mr. Bennett's right shoulder injury and the second in 2005, as a result of Mr. Bennett's left arm and neck pain sustained on August 28, 2004. Mr. Bennett's worker's compensa- tion claims are not directly at issue in this case as Mr. Bennett does not assert retaliatory discharge; however, both parties point to the latter worker's compensation claim as evidence that the other party is "speaking out of both sides" of his or their mouth(s).

January 25, 2005, Mr. Bennett under went a cervical (neck) fusion to address these problems. Mr. Bennett's surgery was successful and Mr. Bennett felt "95% better" than before the surgery. Approximately four months after the surgery, on May 26, 2005, Mr. Bennett's neurosurgeon, Dr. Michael Moran, determined that Mr. Bennett was healing well and released him to work with a 25 percent whole person impairment rating and a permanent 35 pound lifting restriction with no overhead work. Dr. Moran testified in his deposition that Mr. Bennett reached "maximum medical improvement within a reasonable degree of medical certainty" at this point in time.

Following Mr. Bennett's release to work with some permanent restrictions, Nissan's Comprehensive Medical Evaluation ("CME") committee reviewed Mr. Bennett's case to determine whether Mr. Bennett should be evaluated for his ability to continue to perform his job safely.[2] In June 2005, the CME committee told Mr. Bennett that before he would be allowed to return to work he would need to see Dr. Renata Bluhm. The CME committee's recommendation stated that Mr. Bennett was being considered for the CME process because:

> [Mr. Bennett] has had 6 recordable and 5 non-recordable injuries since his hire 7/26/92 resulting in approximately 390 [leave of absence] days. His injuries have resulted in two major cervical surgeries, shoulder surgery and hand surgery. Permanent restrictions have been issued following this current neck surgery, but will not preclude placement. Given his history, and re-current neck issues, there is concern for his continued success.

Mr. Bennett's CME was conducted by Dr. Renata Bluhm, the medical director of OccuPatient. Dr. Bluhm reviewed Mr. Bennett's medical records and the job requirements in the trim and chassis department where Mr. Bennett most recently worked. She obtained a medical history from Mr. Bennett and conducted a physical examination, observing that Mr. Bennett had several well-healed scars on his neck, right shoulder, right wrist, and left palm, and that he had "good range of motion in his back, neck and shoulders with good strength throughout." Dr. Bluhm's CME concluded, however, that "the activities that have led to [Mr. Bennett's] injuries will continue if he were to return to work" and that "[f]or his own safety concern, due to his recurrent significant injuries, it would probably pose a risk for him to continue in this line of work. It would probably not be safe for him to resume these duties." Dr. Karen Oldham, the director of Whole Health, Nissan's on-site medical provider, reviewed Dr. Bluhm's report and determined that Mr. Bennett should not return to work as a Nissan production technician.

On July 13, 2005, Mr. Bennett saw Dr. Robert Landsberg for an independent medical examination ("IME") related to an ongoing worker's compensation claim filed against Nissan stemming from injuries he sustained in August 2003. Dr. Landsberg had previously examined Mr. Bennett in May 2004, and had recommended that Mr. Bennett seek surgical repair of his neck. Dr. Landsberg's July 2005, examination concluded that Mr. Bennett was "much better than he was preoperatively." His report stated that "[Mr. Bennett] was able to work preoperatively and now he is bet-

---

**2.** Nissan's CME committee was made up of Nissan staff doctors and nurses as well as the medical director and lead case manager of Nissan's on-site medical provider. The CME committee was tasked with evaluating the ability of Nissan employees who had multiple injuries to multiple body parts to continue to perform their jobs safely.

ter." In concluding that Mr. Bennett had a permanent 25 percent whole person impairment rating, Dr. Landsberg opined that he would "recommend permanent restrictions of minimal overhead use and minimal lifting overhead of perhaps five to 10 pounds on occasion." He also recommended "[m]aximum lifting should be 40 pounds from the knee to chest level, with proper techniques."

Based on Dr. Oldham's determination that Mr. Bennett not be allowed to return to work, Nissan human resources personnel and medical staff met with Mr. Bennett for a "leave information meeting" where Mr. Bennett was told that based on the CME he would not be allowed to return to work, but that he would remain an employee of Nissan on leave for up to two years.[3] Nissan would continue to pay for his medical benefits so long as he continued to pay his portion of the premiums and he did not accept full-time employment elsewhere. He was permitted to seek part-time employment so long as his employment was pre-approved by Nissan to make sure that he did not take jobs beyond his medical restrictions. Nissan human resources personnel provided Mr. Bennett with information on how he could apply for long-term disability benefits through Nissan's LTD carrier, MetLife, and social security disability benefits as well as participate in vocational rehabilitation programs. Mr. Bennett was informed that if he participated in any vocational rehabilitation programs he might be eligible for additional assistance from Nissan such as paying for transportation, books, tuition, etc. He disagreed with the CME decision because he felt that he could return to work and because both his treating physician and the physician who had conducted his worker's compensation examination had determined that he could work with some restrictions.

On October 6, 2005, the Circuit Court of DeKalb County approved a worker's compensation settlement stemming from injuries to Mr. Bennett's wrist and neck sustained on August 28, 2003, and which eventually led to Mr. Bennett's second neck surgery in January 2005. The Final Settlement Order and Release approved a settlement of $154,000.00 representing a 68.71 percent permanent partial disability to the body as a whole based on the permanent impairment ratings and "[Mr. Bennett's] handicaps with regard to future employment." The Final Settlement Order and Release also recognized that Mr. Bennett waived his Tenn.Code Ann. § 50–6–241(a) rights for reconsideration because Mr. Bennett was "no longer employed by Defendant Nissan."

On November 7, 2005, Mr. Bennett scheduled an appointment with Dr. Moran, his treating physician for his second neck surgery. Dr. Moran testified in his deposition that Mr. Bennett scheduled the November 7 appointment because "he wanted to be checked out. He had a little bit of numbness ... in his finger and arm incision ... and he wanted to know if those had the chance to improve or whether or not they would be permanent and he wanted to return to regular duty." Dr. Moran testified that Mr. Bennett told him during the November 7 visit that he had been terminated by Nissan, but that he had been "very active" chopping firewood at home and that he "didn't feel like he needed restrictions because he was doing fine." Based largely on Mr. Bennett's subjective comments about how he was feeling and his need to return to regular duty, Dr. Moran agreed to lift all restrictions on Mr.

---

**3.** It is unclear the exact date of this meeting as some records indicate the meeting occurred on July 9, while other documents indicate that the meeting occurred on July 19. The exact date of the meeting is not relevant to the case.

Bennett releasing him to "full duty without restrictions." Dr. Moran's notes from the November 7 visit indicate that "[Mr. Bennett] feels like if his restrictions are lifted that would allow him to get another job and I think that would be fine and he will be careful in the future." Dr. Moran's notes from that visit also state that "[Mr. Bennett] does understand that he still should take precautions." Dr. Moran testified in his deposition that such precautions included avoiding extreme lifting as well as deceleration or high velocity sports such as water skiing.

On December 8, 2005, Mr. Bennett sent a certified letter to Nissan to the attention of Mr. Glen Lewis, Nissan human resources section manager, requesting that Nissan allow him to return to work. In the letter, Mr. Bennett stated that his treating physician, Dr. Moran, had released him to full duty without restrictions and that he felt that he was able to return to work. Mr. Bennett sent another letter stating essentially the same thing to the attention of Ms. Linda Eustice, a human resources specialist for Nissan, on January 7, 2006. On January 11, 2006, Dr. Oldham responded to Mr. Bennett on behalf of Nissan by letter stating that "repetitive work in heavy industry is not an appropriate job for you. Every time we fix one of your injuries and you are released without restrictions, you develop another injury." Dr. Oldham's letter informed Mr. Bennett that Nissan could not allow him to return to work because he could not safely continue to perform his job duties.

On April 4, 2006, Mr. Bennett scheduled an appointment with Dr. Renata Bluhm to get a physical examination. Mr. Bennett did not tell Dr. Bluhm that she had previously examined him at the request of Nissan, though he did tell her about his recent neck surgery and his carpal tunnel syndrome.[4] Mr. Bennett testified in his deposition that he told Dr. Bluhm that he needed to get a physical for a job with a construction company. Though Mr. Bennett acknowledged in his deposition that he did not have a specific job offer at the time he went to see Dr. Bluhm in April 2006, he described the type of duties he would have at the construction company as "driving a truck, and maybe a heavy piece of equipment, and probably operating a [hand] shovel." Dr. Bluhm examined Mr. Bennett including his range of motion and gave him a 50 pound weight restriction.

Mr. Bennett filed a Complaint on May 5, 2006, alleging Nissan's failure to return him to work constituted discriminatory action in his terms and conditions of employment in violation of the Tennessee Handicap Act ("THA") and Tennessee Human Rights Act ("THRA"). He alleged that his "neck injury and/or other conditions constituted an impairment which substantially limited a major life activity." Alternatively, he alleged that Nissan "perceived or regarded [Mr. Bennett] as having an impairment which substantially limited a major life activity." Mr. Bennett alleged that his "work performance met [Nissan's] legitimate expectations, and he was physically able to perform his job duties and all essential functions of his job with [Nissan] with or without accommodation, but they have nonetheless refused to return him to work."

In March 2007, Mr. Bennett received information from Nissan about a buy-out program that Nissan was offering to its employees to voluntarily terminate their

---

4. It is unknown whether Dr. Bluhm recognized or recalled Mr. Bennett from her earlier exam of him, though, Mr. Bennett testified that he did not believe she recognized him. It is also unknown whether Mr. Bennett's medical history was fully disclosed to Dr. Bluhm during Mr. Bennett's April 2006 examination.

employment with Nissan; he received this information because he was still a Nissan employee, albeit on leave. On March 13, 2007, Mr. Bennett agreed to voluntarily terminate his employment with Nissan in exchange for a lump sum payment of approximately $58,000.00. His voluntary termination became effective March 30, 2007, and he understood that by accepting the buy-out program he would not be eligible for re-employment with Nissan.

On September 28, 2007, Nissan filed a motion for summary judgment including a statement of undisputed facts and a memorandum in support of its motion with exhibits. Mr. Bennett filed a response to Nissan's motion and statement of undisputed facts as well as a statement of additional undisputed facts with exhibits. Nissan filed a reply to Mr. Bennett's responses to Nissan's statement of undisputed facts as well as a response to Mr. Bennett's statement of additional undisputed facts. A hearing was held on April 4, 2008, and the trial court granted Nissan's motion in a memorandum and order on April 9, 2008. The trial court found:

> There are no disputed facts to go before the trier of fact, and the Defendant [Nissan] is entitled to a judgment at law as to the first issue; because the Defendant [Nissan] has successfully negated an essential element of Defendant's [sic] case, in that the Defendant [sic] does not meet the statutory definition of "handicapped."

The trial court also held that Nissan was entitled to summary judgment on the issue of the legality of Nissan's CME program because Mr. Bennett waived the issue by failing to plead the issue in the Complaint or in an Amended Complaint and only raised it for the first time in his Response to Defendant's Motion for Summary Judgment. Finally, the trial court held that Mr. Bennett's claim for lost wages, if successful, would be cut-off as of the date his voluntary termination was effective finding that Mr. Bennett's argument that he accepted the buy-out under fraud or duress was without merit.

In his brief on appeal, Mr. Bennett raises only one issue—whether the trial court erred in granting summary judgment to Nissan based on a finding that Mr. Bennett was not "handicapped" or "qualified" for the position under Tennessee's anti-discrimination laws.[5]

## II. Standard of Review

The issues were resolved in the trial court on summary judgment. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn.2003). This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50–51 (Tenn.1997). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Stovall v. Clarke*, 113

---

5. In oral argument before this Court, Mr. Bennett's counsel did not take issue with the trial court's finding that Mr. Bennett waived the issue of whether Nissan's CME program violated the THRA because, he contended, Mr. Bennett did not actually attempt to raise this issue as a separate cause of action in the trial court, rather he merely attempted to argue that the CME program, as applied to Mr. Bennett, was against public policy. Mr. Bennett's counsel also conceded in oral argument that the effect of Mr. Bennett accepting the buy-out would be to cut off his claim for lost wages as of the date his voluntary termination took effect; however, he argued that it was Mr. Bennett's contention that Mr. Bennett's acceptance of the buy-out should be invalidated because he was forced to sign it under economic duress. Mr. Bennett did not, however, brief this issue. As explained more fully, *infra*, our disposition of this case pretermits this issue.

S.W.3d 715, 721 (Tenn.2003); *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn.2002).

## III. Discussion

Mr. Bennett contends on appeal that the trial court erred in granting Nissan's motion for summary judgment because there are material facts in dispute. The summary judgment analysis has been clarified in two recent opinions by the Tennessee Supreme Court. *See Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76, 86 (Tenn.2008); *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn.2008). The summary judgment analysis to be used is as follows:

> The moving party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *accord Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). The moving party has the ultimate burden of persuading the court that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). Accordingly, a properly supported motion for summary judgment must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn.1998). If the moving party fails to make this showing, then "the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the *motion for summary judgment* fails." *McCarley*, 960 S.W.2d at 588; *accord Staples*, 15 S.W.3d at 88.

The moving party may make the required showing and therefore shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8–9 (Tenn.2008); *see also McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215 n. 5. Both methods require something more than an assertion that the nonmoving party has no evidence. *Byrd*, 847 S.W.2d at 215. Similarly, the presentation of evidence that raises doubts about the nonmoving party's ability to prove his or her claim is also insufficient. *McCarley*, 960 S.W.2d at 588. The moving party must either produce evidence or refer to evidence previously submitted by the nonmoving party that negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan*, 270 S.W.3d at 8–9. We have held that to negate an essential element of the claim, the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party. *See Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn.2004). If the moving party is unable to make the required showing, then its motion for summary judgment will fail. *Byrd*, 847 S.W.2d at 215.

If the moving party makes a properly supported motion, then the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215. The nonmoving party may satisfy its burden of production by:

(1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule [56.07].

*McCarley*, 960 S.W.2d at 588; *accord Byrd*, 847 S.W.2d at 215 n. 6. The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party. *McCarley*, 960 S.W.2d at 588. "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd*, 847 S.W.2d at 215. A disputed fact presents a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.* *Martin*, 271 S.W.3d at 83–84.

## A. Disability Discrimination Claim

▆▆▆ The Tennessee Disability Act ("TDA")[6] prohibits private employers from discriminating against employees "based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." Tenn.Code Ann. § 8–50–103(b). The TDA embodies the rights and definitions of the THRA. *Barnes v. Goodyear*

*Tire and Rubber Co.*, 48 S.W.3d 698, 705 (Tenn.2000). Accordingly, there are three elements to a claim for discrimination under the TDA; a claimant must show: "(1) that the individual was qualified for the position; (2) that the individual was disabled; and (3) that the individual suffered an adverse employment action because of that disability." *Barnes*, 48 S.W.3d at 705. The third element, or causation element, may be established by either direct or indirect evidence of discrimination. *Id.* at 710. The threshold issue, however, is whether the claimant is "disabled." *Barnes*, 48 S.W.3d at 709–710; *Cecil v. Gibson*, 820 S.W.2d 361, 365 (Tenn.Ct.App. 1991).

When interpreting Tennessee's anti-discrimination laws, such as the TDA and the THRA, the Tennessee Supreme Court has stated that the courts are "neither bound by nor restricted by the federal law," however, the Court also noted that the legislature's stated purpose in codifying the THRA "was to prohibit discrimination in a manner consistent with 'the federal Civil Rights Act of 1964, 1968, and 1972,'" and, as such, courts "may look to federal law for guidance in enforcing our own anti-discrimination laws." *Barnes*, 48 S.W.3d at 705; *see* Tenn.Code Ann. § 4–21–101(a)(1) and (2); *Forbes v. Wilson Cty. Emergency*, 966 S.W.2d 417, 420 (Tenn. 1998); *see also Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579 (Tenn.Ct. App.2004); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir.2008) *rehearing and rehearing en banc denied* (Aug. 14, 2008). In fact, the TDA elements are very similar to those of the

---

6. The Tennessee Disability Act was formerly known as the Tennessee Handicap Act. Effective April 7, 2008, the legislature amended the Act changing all references to "handicap" within the Act to "disability" including changing the name. *See* 2008 Tenn. Pub. Acts, ch.

706, §§ 3, 5. While the facts of this case occurred prior to the enactment of the amendments, the substance of the Act was not amended and, therefore, we find it appropriate to refer to the Act and the terms as amended.

ADA, but do not include a "reasonable accommodation" component. *Roberson v. Cendant Travel Services, Inc.,* 252 F.Supp.2d 573, 583 (M.D.Tenn.2002).

In the present case, the trial court found there were no material facts in dispute and that Nissan affirmatively negated an essential element of Mr. Bennett's claim. Specifically, the trial court found that Mr. Bennett did not meet the definition of "handicapped," or "disabled" as it is now used, under the statute. The trial court also noted that the other two elements of a TDA claim could "not be answered in the affirmative."

## 1. Whether Mr. Bennett was "Disabled"

The threshold issue in a claim under the TDA is whether "the individual was disabled." *Barnes,* 48 S.W.3d at 705. The THRA defines "disability," as "with respect to a person, (i) A physical or mental impairment that substantially limits one (1) or more of such person's major life activities; (ii) A record of having such an impairment; or (iii) Being regarded as having such an impairment...." Tenn. Code Ann. § 4–21–102(3)(A). This definition is identical to the one in the ADA. *See* 42 U.S.C. § 12102(2) (2008).[7] Accordingly, there are three ways a claimant can meet the statutory definition of "disabled."

Mr. Bennett alleged in the Complaint that his "neck injury and/or other conditions constituted an impairment which sub-

stantially limits a major life activity" or, alternatively, that Nissan regarded Mr. Bennett as having an impairment that substantially limited him in the major life activity of working.[8] Nissan disputes that Mr. Bennett is substantially limited in the major life activity of working, or any other major life activity, has a record of such an impairment or that it regarded him as having such an impairment.

### i. *Substantial Limitation of a Major Life Activity*

■ Neither the TDA nor the ADA define "physical or mental impairment" or what constitutes a "major life activity." The U.S. Supreme Court has recognized two potential sources of guidance on the meaning of these terms: the Equal Employment Opportunity Commission ("EEOC") and the Rehabilitation Act regulations issued by the Department of Health, Education, and Welfare ("HEW"), which appear without change in the current regulations issued by the Department of Health and Human Services ("HHS"). Both the EEOC and the HEW Rehabilitation Act regulations define "physical or mental impairment" as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine" as well as "[a]ny

---

**7.** Americans with Disabilities Act ("ADA") of 1990 § 2 *et seq.,* 42 U.S.C. § 12101 *et seq.* The ADA was recently amended to broaden the definition of "disability" by Pub.L. 110–325, September 25, 2008, 122 Stat. 3553, however, the amendments did not take effect until January 1, 2009; consequently, we will use the language of the statute and relevant interpretations as the events on which this litigation is based occurred prior to the amendment's effective date.

**8.** In oral argument before this Court, Mr. Bennett's counsel argued that Mr. Bennett did not contend that he had an impairment that substantially limited a major life activity, rather that Mr. Bennett had a record of such an impairment or, in the alternative, that Nissan regarded Mr. Bennett as having such an impairment.

mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h); *see* 45 C.F.R. § 84.3(j)(2)(i).

■ However, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). A claimant must also demonstrate that the impairment substantially limits one or more major life activities. Tenn.Code Ann. § 4–21–102(3)(A); *Barnes, supra* at 706; *see* 42 U.S.C. § 12102(2)(A). The EEOC regulations as well as the HEW Rehabilitation Act regulations provide examples of "major life activities" that include functions such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[9] 29 C.F.R. § 1630.2(i); 45 C.F.R. § 84.3(j)(2)(ii).

In evaluating whether an individual is substantially limited in a major life activity, the EEOC regulations list several factors that may be considered:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). When the major life activity under consideration is that of working, the EEOC uses a specialized definition of "substantially limits":

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).[10]

The EEOC identifies several additional factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including the geographical area to which the individual has reasonable access, and "the number and types of jobs utilizing similar training, knowledge, skills

---

9. The U.S. Supreme Court has stated several times in recent years that it is reluctant to accept working as a major life activity, *see Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) and *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 199, 122 S.Ct. 681, though it has never held that working is not a major life activity because in each of the cases where the major life activity of working was at issue the parties agreed that working constituted a major life activity. The Tennessee Supreme Court, however, has not expressed such doubts, holding that "the ability to report for work" is a major life activity and "an impairment that results in the inability to appear for work limits a major life activity by disqualifying one from a broad class of jobs." *Barnes,* 48 S.W.3d at 706.

10. We note that Congress recently amended the ADA taking issue with, among other things, the EEOC's regulations interpreting the term "substantially limits" as "significantly restricted." The amendment, which took effect January 1, 2009, directs the EEOC to change this standard in its regulations as it was "inconsistent with congressional intent, by expressing too high a standard." *See* ADA Amendments Act of 2008, 2008 Acts. Pub.L. 110–325, § 2(8), Sept. 25, 2008, 122 Stat. 3553. Considering that the facts of this case pre-date the ADA Amendments Act of 2008, we need not be concerned with the impact of the Act's apparent broadening of the definition of "disabled" under the ADA; nevertheless, even if the amendments were applicable we do not believe that Mr. Bennett, under the facts of this case, would meet this broader definition of "disabled."

or abilities, within the geographical area, from which the individual is also disqualified." 29 C.F.R. §§ 1630.2(j)(3)(ii)(A) and (B). The EEOC interpretive guidance clarifies that, "[t]he terms 'number and types of jobs' and 'number and types of other jobs,' as used in [29 C.F.R. § 1630.2(j)(3)(ii)(B) ] are not intended to require an onerous evidentiary showing[;][r]ather, the terms only require the presentation of evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., "few," "many," "most") from which an individual would be excluded because of an impairment." 29 C.F.R. pt. 1630, App. § 1630.2(j).

The U.S. Supreme Court summarized the rule accordingly:

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton,* 527 U.S. at 492, 119 S.Ct. 2139. The Tennessee Supreme Court recognized this principle when it held that "an impairment that may disqualify one from working at a job of choice does not limit a major life activity," but that an individual's physical or mental impairment would be considered as substantially limiting the major life activity of working if it disqualified him or her from a broad class of jobs. *Barnes,* 48 S.W.3d at 706 (*citing Sutton,* 527 U.S. at 489–91, 119 S.Ct. 2139); *see also Cecil,* 820 S.W.2d at 365 ("While 'working' is a major life activity, working at specific job of one's choice is not.").

Whether an individual has a disability or whether an impairment substantially limits a major life activity should be made on an individual, or case-by-case, basis. *Cecil,* 820 S.W.2d at 365; *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 198, 122 S.Ct. 681 (*citing* 29 C.F.R. pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.")); *see also Hallums v. Coca–Cola Bottling Co. Consol.,* 874 S.W.2d 30, 32 (Tenn.Ct.App.1993) ("The inquiry into whether the impact of an employee's impairment upon major life activities is sufficient to bring him or her within the protection of Tennessee's anti-discrimination laws is necessarily an individual one."). The impairment's impact must be permanent or, at least, long-term, 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii), and it is insufficient for individuals attempting to prove disability status to "merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 198, 122 S.Ct. 681. Moreover, "the inquiry should not be limited to the physical or mental condition alone, but should take into consideration the individual job seeker and the type of employment being sought." *Cecil,* 820 S.W.2d at 365 (internal citations omitted).

*Nissan's Burden of Production on Summary Judgment*

In Nissan's motion for summary judgment, it contended that "Mr. Bennett cannot show that he has an actual handicap as defined in the THRA" because, in fact, Mr. Bennett testified in his deposition that he feels "awesome" and "great" and that he felt this way in July 2005, when Nissan determined that he should not return to work. Nissan, as the moving party, had

the burden to negate an essential element of Mr. Bennett's claim or establish that he could not prove an essential element of his claim at trial. *Martin,* 271 S.W.3d. at 83–84 (*citing Hannan,* 270 S.W.3d at 8–9; *McCarley,* 960 S.W.2d at 588; *Byrd,* 847 S.W.2d at 215 n. 5). We have determined Nissan met its burden.

The record shows that at the time Nissan made the decision not to allow Mr. Bennett to return to work Mr. Bennett was feeling "great" and stated that he felt he could work and that both Dr. Moran and Dr. Landsberg concluded that, medically, he could return to work, albeit with some restrictions. Mr. Bennett also testified in his deposition that over the months immediately following the leave information meeting he was "active" at home chopping firewood and taking his kids to their favorite amusement park. This is sufficient evidence to negate the element that Mr. Bennett actually had a physical impairment that substantially limited a major life activity.

*Mr. Bennett's Burden of Production on Summary Judgment*

The burden of production then shifted to Mr. Bennett to produce evidence of specific facts establishing that genuine issues of material fact exist. *McCarley,* 960 S.W.2d at 588; *Byrd,* 847 S.W.2d at 215. Mr. Bennett could have satisfied this burden of production by:

(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule [56.07].

*Martin,* 271 S.W.3d at 83–84. Mr. Bennett, however, failed to do so. The record

shows that Mr. Bennett suffered from a musculoskeletal impairment resulting from various work-related injuries including the most recent in August 2003 and that he underwent surgery for that injury. Disability discrimination laws, however, do not apply to "impairments that are transitory and minor," which includes "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3); *see Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 196, 122 S.Ct. 681. Mr. Bennett, by his own testimony and that of his treating physician, Dr. Moran, acknowledged that Mr. Bennett had fully recovered from his most recent surgery within three to four months. *See* Tenn.Code Ann. § 4–21–102(3)(A)(I). Moreover, Mr. Bennett admitted that in July 2005, when Nissan made its decision to place him on leave he felt "great" and was ready to work. Based on this evidence, we find no genuine issue of material fact and conclude that Mr. Bennett did not have a physical or mental impairment that substantially limited a major life activity.

*ii. Record of Having an Impairment*

An alternative theory under which an individual asserting a claim of disability discrimination can come within the definition of "disabled" is by showing that he or she has a record of impairment. Tenn.Code Ann. § 4–21–102(3)(A)(ii). "A record of impairment means an individual has a 'history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *MX Group, Inc. v. City of Covington,* 293 F.3d 326, 339 (6th Cir.2002) (*quoting* 28 C.F.R. § 35.104(3)). "Regardless of whether [Plaintiff] is proceeding under a classification or misclassification theory, the record-of-impairment standard is satisfied only if she actually suffered a physical impairment that substantially limited one or more of her major life activi-

ties." *Edwards v. Ford Motor Company,* 218 F.Supp.2d 846, 851 (W.D.Ky.2002) (*citing Hilburn v. Murata Elec.'s N. Am., Inc.,* 181 F.3d 1220, 1229 (11th Cir.1999)). Therefore, "the impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." *Id.* (*quoting* 29 C.F.R. pt. 1630, App. § 1630.2(k)(1997)). This means that claims under Tenn.Code Ann. § 4–21–102(3)(A)(ii), like claims under Tenn.Code Ann. § 4–21–102(3)(A)(i) (based upon actual impairment), are predicated on a showing of a mental or physical impairment that limits one or more major life activities. *Id.; see also Hilburn,* 181 F.3d at 1229; *Colwell v. Suffolk Cty. Police Dep't,* 158 F.3d 635, 645 (2nd Cir.1998).

On appeal, Mr. Bennett did not brief the issue of whether he had a record of having an impairment that substantially limited a major life activity, but in oral arguments before this Court Mr. Bennett's counsel argued that Mr. Bennett had a record of such an impairment as evidenced by the list of work-related injuries Mr. Bennett sustained while working for Nissan as well as his record of surgeries to repair those injuries. However, we have already determined that Mr. Bennett may not proceed with his Tenn.Code Ann. § 4–21–102(3)(A)(i) actual disability claim because his injuries were short-term and did not substantially limit the major life activity of working. The fact that Nissan had extensive paperwork on Mr. Bennett's many injuries and surgeries during the time he worked for Nissan does not transform the degree to which these impairments were substantially limiting so that Mr. Bennett may pursue a viable Tenn.Code Ann. § 4–21–102(3)(A)(ii) record of disability claim.

### iii. *Regarded as Having an Impairment*

 Mr. Bennett could succeed, even without evidence of an actual physical or mental impairment that substantially limited a major life activity, by proving that Nissan regarded him as having such an impairment. The THRA provides that having a disability includes "being regarded as having," Tenn.Code Ann. § 4–21–102(9)(A)(iii), "[a] physical or mental impairment which substantially limits one (1) or more of such person's major life activities." Tenn.Code Ann. § 4–21–102(9)(A)(i). Therefore, individuals who are "regarded as" having a disability are disabled within the meaning of the TDA.

The ADA explains that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). The HEW regulations clarify the ADA definition by explaining that "[i]s regarded as having an impairment" means "(A) has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (C) *has none of the impairments* defined in paragraph (j)(2)(i) of this section *but is treated by a recipient as having such an impairment.*" 45 C.F.R. § 84.3(j)(2)(iv) (emphasis added).

The U.S. Supreme Court summarized this rule that a claimant was "regarded as having an impairment" where "(1) A covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistaken-

ly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139. This principle has been recognized in Tennessee anti-discrimination cases; specifically, the Tennessee Supreme Court has held that a "plaintiff may be regarded as disabled if the defendant treated him as if his impairment substantially limited a major life activity." *Barnes,* 48 S.W.3d at 706 (*citing Sutton,* 527 U.S. 471, 119 S.Ct. 2139); *see also Dunn v. Sharp Mfg. Co. of America,* NO. 01–2679 MA/V, 2003 WL 1793038, at * 5 (W.D.Tenn. Jan. 10, 2003). The prohibition against discriminating against perceived disabilities was designed to combat not just the effects of prejudice, but also the archaic attitudes and erroneous perceptions about the disabled, which is why "Congress expanded the definition of 'handicapped individual' so as to preclude discrimination against '[a] person who has a record of, or is regarded as having, an impairment [but who] may at present have no actual incapacity at all.'" *School Board of Nassau Cty. v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (*citing Southeastern Community College v. Davis,* 442 U.S. 397, 405–06, n. 6, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)).

*Nissan's Burden of Production on Summary Judgment*

Nissan contended in its Memorandum in Support of its Summary Judgment Motion that Mr. Bennett cannot show that he was regarded as handicapped by Nissan because he testified that no one at Nissan ever made any comments that would lead him to believe that he was viewed as disabled. Specifically, Mr. Bennett was asked, "Do you recall anyone at Nissan ever making a negative comment to you about your work related injuries?" and Mr. Bennett responded that he did not. Moreover, Nissan points to the fact that Nissan did not make its decision with regard to Mr. Bennett's ability to safely perform his job as production technician based on any "myths or archaic attitudes about the disabled," but rather upon the medical recommendations of Dr. Bluhm and Dr. Oldham. Linda Eustice, a registered nurse and Nissan human resources specialist in 2005, testified that Nissan based its decision to disallow Mr. Bennett's return to work on a holistic medical evaluation of the cumulative impact of Mr. Bennett's multiple injuries and surgeries that resulted in the conclusion that Mr. Bennett could not continue to function safely in his production technician position. Finally, Nissan argued that the fact that it did not believe that Mr. Bennett could safely continue his job as a production technician did not mean that Nissan regarded Mr. Bennett as substantially limited in the major life activity of working because, "[a]n impairment that may disqualify one from working at a job of choice does not limit a major life activity." *See Barnes,* 48 S.W.3d at 706. This proof was sufficient to shift the burden to Mr. Bennett to establish a genuine issue of material fact for trial or otherwise show that summary judgment was not appropriate. *See Martin, supra.*

*Mr. Bennett's Burden of Production on Summary Judgment*

Mr. Bennett responded by asserting that Nissan was trying to "speak out of both sides of its mouth" by saying that he was "too disabled to work" but not "disabled" for purposes of anti-discrimination laws. Mr. Bennett contends that the fact that Nissan presented him with information on how to apply for long-term and social security disability benefits during the July 2005 leave information meeting is proof that Nissan regarded him as having a disability. Mr. Bennett responded to Nissan's contention that he was not allowed to return to work simply because Nissan did not believe he could perform

the single job of production technician by pointing to the following: Dr. Bluhm's report, which expressed the opinion that "it would probably pose a risk for [Mr. Bennett] to continue *in this line of work;*" statements made by Nissan during the July 2005, leave information meeting that "it would not be in [Mr. Bennett's] best interest to continue in *automotive manufacturing production work;*" and statements in Dr. Oldham's letter that "*[r]epetitive work in heavy industry* is not an appropriate job for you." (Emphasis added). Mr. Bennett argues that this evidence demonstrates that Nissan regarded him as substantially limited in the ability to perform a "substantial class of jobs" or "broad range of jobs." *See Barnes,* 48 S.W.3d at 706; *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139; 29 C.F.R. § 1630.2(j)(3)(i).

Mr. Bennett relies on three Sixth Circuit cases and an unpublished opinion from the U.S. District Court for Middle Tennessee in support of his contention that Nissan regarded him as substantially limited in the major life activity of working. While we find all of these cases distinguishable on the facts, they provide some helpful guidance on the issue of what constitutes a "broad range" or "substantial class" of jobs.

*Todd v. City of Cincinnati,* 436 F.3d 635 (6th Cir.2006), involved the Cincinnati police department's denial of an applicant for the position of firearms instructor because the applicant had been given a disability pension. The court found that evidence that the officials who interviewed the applicant made statements and notes during the interviewing process that they had "doubts" that the applicant could "physically do the demanding work" showed that they thought the applicant should be rejected because of the medical disability. *Todd,* 436 F.3d at 636–37. The court explained that this evidence "raises an issue

of material fact as to whether Sgt. Ventre and Captain Jones 'regarded the plaintiff as disabled,' and did not believe he should be hired because he was already receiving a disability pension from the city." *Id.* Mr. Bennett suggests that the Sixth Circuit believed that the position of firearms instructor represented a broad class of jobs, however, the *Todd* court did not reach the "broad class of jobs" question because it found sufficient evidence that the police department may have regarded Todd as disabled since it appeared as though the department made its decision based on the mere assumptions of Sgt. Ventre and Captain Jones that Todd could *not do the work.* This distinguishes the *Todd* case from the present facts because here we have evidence that Nissan relied on the medical advice of Dr. Bluhm and Dr. Oldham and not on any assumptions, myths or fears of Nissan's non-medical managers.

*Henderson v. ARDCO, Inc.,* 247 F.3d 645, 651 (6th Cir.2001), involved an assembly line employee in a manufacturing facility who was restricted from stooping or bending and from lifting more than 25 pounds frequently or 40 pounds infrequently and not allowed to return to work by the plant manager who told her that "You know what company policy is . . . you have to be 100 percent to work here." The court found that the employee had established a valid "regarded as" claim because "Ardco's 100%-healed rule, may, for the purposes of summary judgment, be interpreted as treating [employee] as incapable of work in a manufacturing operation." *Henderson,* 247 F.3d at 652. While there are many factual distinctions that distinguish the *Henderson* case from the facts presented here and even considering the fact that the Henderson court relied on a legal analysis that was subsequently criticized and overruled by the U.S. Supreme Court, *see Toyota Motor Mfg., Ky., Inc.,*

534 U.S. at 197–98, 122 S.Ct. 681 (finding that the Sixth Circuit erroneously considered plaintiff's ability to perform the manual tasks associated with her assembly line job in determining that plaintiff was substantially limited in the major life activity of performing manual tasks), the *Henderson* court provided a helpful discussion of whether an individual was regarded as unable to perform a "broad range" or "substantial class" of jobs.

The *Henderson* court explained that the Sixth Circuit had previously held that an individual with a 23 pound lifting restriction may be disabled "by being substantially impaired in the major life activity of working, if that restriction prevented him from performing 'medium to heavy lifting and other forms of manual labor,' and those jobs constituted the majority of the jobs for which the plaintiff is suited based on his age, education, and experience." *Henderson*, 247 F.3d at 652 (*citing Burns v. Coca–Cola Enters., Inc.*, 222 F.3d 247, 253–54 (6th Cir.2000) (finding plaintiff qualified as "disabled" under the ADA by an impairment that reduced by "at least 50% of the jobs" previously available to him)). The *Henderson* court, applying the *Burns* standard to the facts of that case, found that "Henderson appears to have raised a genuine issue of material fact that Ardco perceived her as unable to perform anything but 'light duty' work, and that it perceived that medium to heavy manual labor constituted a majority of the jobs available to her based on her age, education and experience." *Id.*

Mr. Bennett argues with regard to *Moorer v. Baptist Memorial Health Care System*, 398 F.3d 469 (6th Cir.2005), where the court found substantial evidence that Moorer's medical status as an alcoholic played a significant role in Baptist's decision to fire him, that "[i]f someone who is or may be an alcoholic can receive the protection of the ADA or THRA on ["regarded as"] grounds, surely someone who has sustained legitimate injuries in the course of his work and is handicapped or regarded as such thereby should receive the protection of the law." We do not find the *Moorer* case instructive to the facts here. Unlike Mr. Bennett, who was apparently only regarded as not being able to perform automotive production jobs or repetitive heavy lifting but was still able to perform manual labor jobs that did not involve automobile assembly or repetitive heavy lifting, someone who suffers from alcoholism would be unable to perform any job effectively whether that job involved heavy duty or a sedentary desk job.

Finally, Mr. Bennett points to *Jones v. Nissan North America, Inc.*, No. 3:07–0645, 2008 WL 4279854 (M.D.Tenn. Sept. 12, 2008), in which the district court found summary judgment inappropriate on the issue of whether Nissan regarded Mr. Jones as disabled. In the *Jones* case, Nissan made an argument for placing Mr. Jones on leave that was similar, though with distinctions, to the one it makes here. Nissan argued in *Jones* that "there can be no question that Nissan did not place Mr. Jones on a leave of absence due to 'myths or archaic attitudes about the disabled,'" instead "it placed Jones on leave due to a court order." The *Jones* court found that "whether the Chancery Court ruling was the real basis for Nissan's decision presents a question of fact for the jury[,]" and that this was particularly so since, "[u]nder the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent.... [and] that question—i.e., the employer's motive—is one rarely susceptible to resolution at the summary judgment stage." *Jones*, 2008 WL 4279854, at *9 (*citing Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir.2001)). The *Jones* court explained:

Here, even leaving aside the fact that Jones did not attend college and has spent his entire work career doing manual labor, the restrictions placed upon him by Dr. Kubina [Nissan's on-site medical director] are much more onerous than those placed upon the plaintiff in [*McKay v. Toyota Motor Mfg., U.S.A.*, 110 F.3d 369 (6th Cir.1997)]. The Court simply cannot conclude as a matter of law that a high school graduate who has spent the majority of his working life on an assembly line would not be precluded from a broad class of jobs where his restrictions consisted of "no lifting, no use of power tools, and no use of hand tools."

*Id.* at *10.

Nissan cites *McKay* in support of its contention that "automobile production manufacturing" is not a substantial class of jobs. *McKay* involved an automobile assembly line worker with carpel tunnel syndrome who was restricted from lifting more than 20 pounds, using vibrating tools and the repetitive use of her right hand and who was terminated for her excessive absences. In determining whether the plaintiff was substantially limited in the major life activity of working, the *McKay* court held that "plaintiff's impairment disqualified her from only a narrow range of repetitive-motion positions and not from working in the broader class of manufacturing jobs." *McKay*, 110 F.3d at 371. Citing an Eighth Circuit case with facts similar to those in *McKay*, the *McKay* court determined that,

[T]he physical restrictions caused by plaintiff's disability do not significantly restrict her ability to perform the class of jobs at issue, manufacturing jobs; at best, her evidence supports a conclusion that her impairment disqualifies her from only the narrow range of assembly line manufacturing jobs that require repetitive motion or frequent lifting of more than ten pounds. It follows that her limited impairment would not significantly restrict her ability to perform a broad range of jobs in various classes.

*McKay*, 110 F.3d at 371; *see Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir.1995).

Nissan also points to an unpublished U.S. district court decision, *Ballinger v. Nissan North America, Inc.*, C.A. No. 3–99–1156 (M.D.Tenn. Dec. 13, 2000), which considered an almost identical disability discrimination claim by a former Nissan employee. The employee in the *Ballinger* case claimed that Nissan had regarded him as disabled because it determined, as a result of a medical evaluation, that he should not return to his production job at Nissan's Smyrna facility. The *Ballinger* court dismissed the case on summary judgment, finding that the plaintiff had failed to established that he was "disabled;" specifically, the court reasoned that being regarded as unable to perform production jobs at Nissan, "does not necessarily mean that Defendant regarded Plaintiff as substantially limited in any major life activity, including working." *Ballinger*, C.A. No. 3–99–1156 at p. 12. While this case appears to support Nissan's position in the present case, we find an important distinction between the facts in *Ballinger* and those in the present case.[11] The *Bal-*

11. Mr. Bennett attempted to distinguish *Ballinger* from the present case because in *Ballinger* the Plaintiff had been denied long-term disability benefits by Nissan's LTD carrier who had determined that "given Plaintiff's experience, training, and education, there were a number of available jobs that he could perform, despite his inability to perform the particular jobs available at Nissan," whereas, here, Mr. Bennett was not denied long-term disability benefits; he simply refused to cash the checks because he did not consider him-

*linger* court's decision on the "regarded as" element was primarily based on the following finding:

> [T]he Defendant only considered Plaintiff's ability to perform available jobs at Defendant's Smyrna plant. Defendant thus evaluated Plaintiff solely with respect to working at his former job and other vacant jobs at the facility. Defendant did not consider Plaintiff's ability to perform all production jobs at Nissan or evaluate his ability to work at other jobs with other employers.

*Id.* This contrasts with the record in the present case that shows Nissan may have considered Mr. Bennett's ability to perform other jobs with other employers by telling him that he should not continue working in "automotive manufacturing production" or "repetitive heavy industry."

ADA jurisprudence provides additional guidance. For example, the U.S. Supreme Court in *Sutton* found that the position of global airline pilot was a single job and did not support the claim that the respondent regarded petitioners as having a substantially limiting impairment because "there are a number of other positions utilizing petitioners' skills, such as regional pilot and pilot instructor to name a few, that are available to them." *Sutton*, 527 U.S. at 493, 119 S.Ct. 2139. The *Sutton* court also cited the EEOC's interpretive guidance, which provides as an example "an individual who cannot be a commercial airline pilot because of a minor vision impairment, but who can be a commercial airline co-pilot or a pilot for a courier service, would not be substantially limited in the major life activity of working." *Id.* (*citing* 29 C.F.R. pt. 1630, App. § 1630.2(j)). The EEOC interpretive guidance also provides the example of a professional baseball pitcher who develops a bad elbow and can no longer throw a baseball. In such a case, the pitcher would not be considered substantially limited in the major life activity of working because, like in the case of the visually impaired commercial airline pilot, the individual is not substantially limited in the ability to perform any other major life activity and, with regard to the major life activity of working, he is only unable to perform either a particular specialized job or a narrow range of jobs. 29 C.F.R. pt. 1630, App. § 1630.2(j). On the other hand, EEOC interpretive guidance provides the following example, "an individual who has a back condition that prevents the individual from performing *any heavy labor job* would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs. This would be so even if the individual were able to perform jobs in another class, e.g., the class of semi-skilled jobs." 29 C.F.R. pt. 1630, App. § 1630.2(j) (emphasis added).

Both the *Henderson* and *Moorer* courts noted the "extraordinarily difficult" task of "[p]roving that an employee is regarded as disabled in the major life activity of working" because this question is "embedded almost entirely in the employer's subjective state of mind." *See Henderson*, 247 F.3d at 653; *Moorer*, 398 F.3d at 481 (*citing Ross*, 237 F.3d at 706). *Ross* involved an employer's perception of a back injury as disabling following the termination of a frozen-food salesman with a history of back trouble. The employee returned to work with physical restrictions that included lifting no more than 25 pounds. After having referred to the employee in an internal company memo as a "back case" and a "problem person" that ought to be brought to "termination status," the employee was discharged for malingering and failing to meet his sales quo-

self disabled. We do not find this distinction relevant to the present analysis.

ta. *Ross*, 237 F.3d at 707. The Sixth Circuit reversed the district court's grant of summary judgment, finding there was a genuine issue as to whether Ross was perceived as disabled because "the standard mandates that Campbell Soup Co. must have regarded Ross as significantly limited in his ability to lift or in his ability to work in a broad class of jobs, not simply his job at Campbell Soup ... [and] this is a question of Campbell's state of mind that is more appropriate for the jury than for the judge." *Id.* at 709.

In the present case, according to Nissan, Mr. Bennett cannot or should not do "repetitive work in heavy industry" or work in "automobile production manufacturing." Mr. Bennett has a high school education and, with the exception of a few years working on his family's dairy farm, he has spent his entire career in the manufacturing industry, albeit not always automobile manufacturing. There is no evidence in the record as to what kind and how many "light duty" manual labor jobs exist in the Smyrna area, although Mr. Bennett testified that after he was put on leave from Nissan he looked for other jobs and couldn't find one. He testified that he told Dr. Bluhm in April 2006, that he planned to start a construction job in which he would drive a truck and lift a shovel on occasion, however, he also testified that the construction job did not materialize. With regard to the geographical scope of jobs available to Mr. Bennett, he testified that he had driven up to 60 miles for previous jobs and would be willing to do so again, but would prefer not to.

We believe there exists a genuine issue of material fact as to whether Nissan regarded Mr. Bennett as substantially limited in performing a "broad range" or "substantial class" of jobs based on his age, education, experience and geography. The record indicates that Nissan

thought that Mr. Bennett could not or at least should not continue working in "automobile production manufacturing" or in "repetitive heavy industry," which for purposes of summary judgment may be interpreted as treating Mr. Bennett as incapable of work in a variety of manufacturing operations, though to what extent the record is not clear. While Mr. Bennett put forward little proof as to whether automobile manufacturing or repetitive heavy lifting represents a significant portion of the jobs locally available to him, as the *Henderson* court noted, "this will ultimately be part of [Plaintiff's] burden in showing she was perceived as 'substantially impaired' in working in [Plaintiff's] area." *Henderson*, 247 F.3d at 653, n. 5. Accordingly, the trial court erred in granting summary judgment on this issue.

Notwithstanding the fact that a question of material fact exists as to whether Nissan regarded Mr. Bennett as substantially limited in the major life activity of working, because Nissan need only affirmatively negate one of the three essential elements of Mr. Bennett's TDA claim in order to be entitled to summary judgment in its favor, we will proceed to review the second element—whether Mr. Bennett was "qualified" for the position.

## 2. Whether Mr. Bennett was "Qualified" for the Position

Under the TDA, an employer will not be considered to have unlawfully discriminated against an individual with a disability if the individual's disability "to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." Tenn.Code Ann. § 8–50–103(b). The Tennessee Supreme Court has interpreted this language to require a claimant under the TDA to

show that he or she "was qualified for the position" in addition to the two other elements—that he or she is "disabled" and suffered an adverse employment action. *Barnes,* 48 S.W.3d at 705. The *Barnes* court explained that "[a]n individual may be deemed qualified if the individual can perform, with or without reasonable accommodation, the essential functions of the employment position in question." *Id.* (*citing* 42 U.S.C. § 12111(8); *Southeastern Comm. College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)). The ADA also requires that an individual show that he or she was "qualified" for the position that was sought or from which he or she was removed. 42 U.S.C. § 12111(8). Under the ADA, this inquiry has two prongs: the individual must (1) possess the requisite skill, education, experience, and training for the position; and (2) be able to perform the essential job functions, with or without reasonable accommodation. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *see also Burns,* 222 F.3d at 256.

In the present case, there is no dispute that Mr. Bennett possessed the requisite skill, education, experience, and training for the position. As to the second prong of the "qualified" inquiry, Nissan conceded in its memorandum in support of its motion for summary judgment that the restrictions placed on Mr. Bennett by his physician do not prevent him from performing the essential functions of the production technician position; however, Nissan contended that Mr. Bennett should not be deemed "qualified" for the production technician position because continuing in such employment would place Mr. Bennett's health and safety at risk. Nissan's medical department came to this determi-

nation based on a holistic medical evaluation of the cumulative impact of Mr. Bennett's multiple injuries and surgeries to multiple parts of his body.[12] Nissan further argued that Mr. Bennett is trying to "have it both ways," by claiming he was disabled and not qualified for working for purposes of his workers' compensation claim, but qualified and able to work for purposes of his disability discrimination claim.

In response, Mr. Bennett contended that he was qualified for the position because "there has been no showing whatsoever that Mr. Bennett's work performance was in any way unsatisfactory to Nissan," and because there were no permanent restrictions placed on him that would have prevented him from performing his job duties at Nissan. Mr. Bennett argued that Nissan's CME program, as applied to him, constituted a qualification standard or other selection criteria that was used to screen out or tended to screen out an individual with a disability, the use of which is prohibited by the ADA and, as Mr. Bennett argued, against Tennessee public policy.

■■■ The THRA defines "discriminatory practices" as "any direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons because of race, creed, color, religion, sex, age or national origin." Tenn.Code Ann. § 4–21–102(4). The ADA is more specific, defining the term "discriminate against a qualified individual on the basis of disability" as "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or

---

12. The holistic medical review of Mr. Bennett was conducted through the CME program, which was designed to evaluate the employee's whole body rather than a single area affected by a particular injury as a treating physician would do.

a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C.A. § 12112(b)(6). Therefore, while the ADA prohibits employers from using "qualification standards" as a tool to block a disabled person from advancing in the workplace, the ADA expressly permits an employer to apply "qualification standards" that deny a job to an individual with a disability as long as those standards are "job-related" and "consistent with business necessity." 42 U.S.C. §§ 12112(b)(6) and 12113(a) (2008); 29 C.F.R. § 1630.15(b)(1).

The ADA permits an employer's qualification standards, tests, or other selection criteria to include "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b) (2008). This "direct threat" language of the statute has been defined by the EEOC regulations as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r) (2009); 29 C.F.R. § 1630.15(b)(2); *see Chevron U.S.A., Inc. v. Echazabal,* 536 U.S. 73, 78–79, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) (upholding the EEOC regulations interpreting "direct threat" under the ADA).[13]

 In order to rely on the direct threat defense, however, the EEOC regulations require an employer to make a particularized inquiry into the harms the employee would probably face. *Echazabal,* 536 U.S. at 85–86, 122 S.Ct. 2045. This requirement aims to prevent workplace paternalism or sham protection where an employer claims to act for the good of the disabled individual in reliance on untested and pretextual stereotypes. *See id.;* 42 U.S.C. § 12101(a)(5). Therefore, "the direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Id.* at 86, 122 S.Ct. 2045 (*citing* 29 C.F.R. § 1630.2(r)). In determining whether an individual would pose a direct threat, the EEOC regulations set out four factors to be considered:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r).

*Nissan's Burden of Production on Summary Judgment*

We find that Nissan presented sufficient evidence that Mr. Bennett was not "quali-

---

**13.** Mr. Bennett argues that we should not rely on *Echazabal* because that case involved what Mr. Bennett describes as a "matter of life and death" (Chevron denied Mr. Eschazabal, who had hepatitis C, employment because his condition would have been aggravated by exposure to toxins at Chevron's refinery), whereas, in Mr. Bennett's view, the present case only involves "multiple musculoskeletal injuries."

We are not persuaded that this distinction, if one even exists, is relevant because the *Echazabal* Court did not address the specifics of Mr. Eschazabal's disability; it only addressed the issue of whether the EEOC's regulation extending the direct threat defense to include "harm to the individual" was permissible under the ADA.

fied" for the position of production technician because he posed a direct threat to his own safety if he continued such employment. Nissan also sufficiently demonstrated that in making this determination it conducted an individualized assessment of Mr. Bennett's ability to safely perform his job and that the assessment was based on reasonable medical judgment.

Nissan demonstrated through the deposition testimony of Mr. Bennett's treating physician, Dr. Michael Moran, that following Mr. Bennett's second neck surgery in early 2005, Dr. Moran imposed permanent light duty (35 pounds) lifting restrictions with no overhead work and a twenty-five percent (25%) whole person impairment rating when Mr. Bennett was at his maximum medical improvement on May 26, 2005. While Nissan's human resources director for the safety and medical department, Kerry Dove, testified in his deposition that the restrictions assigned by Dr. Moran did "not exceed the essential functions of the job,"[14] Nissan showed that Mr. Bennett's injuries had increased in frequency and severity over the course of his employment with Nissan. *See* 29 C.F.R. § 1630.2(r)(1), (2).

Dr. Bluhm, who conducted the holistic evaluation of Mr. Bennett, determined that he had experienced "significant and recurrent injuries" that required surgery and that, "despite surgical repair, he has had recurrent injury requiring a second surgery of the neck and recurrent pain of the right shoulder." *See* 29 C.F.R. § 1630.2(r)(1), (2). Dr. Bluhm concluded that if Mr. Bennett were to return to his job as a production technician, "his injuries will continue." *See* 29 C.F.R. § 1630.2(r)(3). Dr. Bluhm wrote in her report to Nissan's on-site medical director, Dr. Oldham, that "[f]or his own safety concern" and "due to his recurrent significant injuries," it would pose "a risk for him to continue" his job at Nissan. *See* 29 C.F.R. § 1630.2(r)(2), (3). Based on Dr. Bluhm's evaluation and the fact that Mr. Bennett had sustained numerous injuries as a result of performing the job of production technician, Dr. Oldham determined that it would not be safe for Mr. Bennett to return to his job at Nissan and she notified Nissan management that he should not be allowed to return to his job duties as production technician. In response to Mr. Bennett's December 2008, letter requesting permission to return to work, Dr. Oldham wrote to Mr. Bennett that "repetitive work in heavy industry is not an appropriate job for you," and that

14. The job requirements for a production technician in the Trim and Chassis department where Mr. Bennett last worked included the following: occasional overhead reaching, occasional climbing, constant bending/stooping, occasional crouching/squatting, constant reaching, occasional use of foot controls, frequent twisting, constant grasping with right and left hands, occasional fine manipulation with right and left hands, constant repetitive right and left hand motion, frequent use of power/battery tools, frequent lifting of 5 lbs., frequent lifting of 10–15 lbs., carrying items weighing 1–15 lbs. a distance of 4–10 ft. (+ or -) 240 times per day. In his response to Nissan's statement of undisputed facts, Mr. Bennett stated that he "disputed the job requirements to the extent of [his] own descrip-

tion of his job duties in his deposition, but otherwise did not dispute the Trim and Chassis job requirements." In his deposition, Mr. Bennett stated that in his career with Nissan he had done "all of them" in zone 3, but that prior to his second neck surgery in 2005, he was working in "zone 3, truck trim," which included installation of left and right front door locks, check link, left and right weather strip, left and right door harness, roof rack, and brake tube. Mr. Bennett described the specific actions he would do in order to install each item. The actions Mr. Bennett described in his deposition conform with Nissan's general description of job requirements for a production technician in the Trim and Chassis department.

"every time we fix one of your injuries and you are released without restrictions, you develop another injury." We find Nissan presented sufficient evidence to negate an essential element of Mr. Bennett's TDA claim—that Mr. Bennett was "qualified" for the position of production technician at Nissan—because Nissan determined through an individualized assessment based on reasonable medical advice that he presented a direct threat to his own safety if he continued working in the position.

*Mr. Bennett's Burden of Production on Summary Judgment*

Mr. Bennett, in his response to Nissan's motion for summary judgment and statement of undisputed facts, disputed several of Nissan's statements; additionally, he filed his own statement of undisputed facts. While Mr. Bennett takes issue with several statements in Nissan's statement of undisputed facts, in order for Mr. Bennett to carry his burden of production he must show that there is a genuine issue of material fact. *Byrd*, 847 S.W.2d at 215. "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Id.* And a disputed fact presents a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.* Accepting Mr. Bennett's facts as true, he failed to produce evidence of specific facts establishing genuine issues of material fact.

Mr. Bennett did not dispute Nissan's job requirements for production technician and his testimony detailing the specific actions he completed in performing his job as a production technician did not contradict Nissan's job requirements nor contest that they were job-related and consistent with business necessity. Mr. Bennett disputed that he posed a direct threat to himself if he continued to work as a production technician at Nissan, relying on his most recent treating physician's removal of all restrictions in November 2005. Such evidence, however, does not sufficiently attack Nissan's evidence that it relied on the reasonable medical judgment of Dr. Bluhm.

Mr. Bennett attempted to cast doubt as to the reasonableness of Nissan's reliance on Dr. Bluhm's CME of Mr. Bennett by suggesting that, because Nissan requested Dr. Bluhm's evaluation, it was medically unreliable. In support of this assertion, Mr. Bennett contrasted his examination experience with Dr. Bluhm with those of his treating physician, Dr. Moran, as well as his worker's compensation physician, Dr. Landsberg. Mr. Bennett described his CME with Dr. Bluhm in June 2005 as lasting only "5 minutes," and testified that Dr. Bluhm was "rude" to him; he complained that "she would start one [test], and before I could finish doing what she requested, she was telling me to do something else." By contrast, Mr. Bennett testified that Dr. Landsberg conducted his examination slower, allowing Mr. Bennett to complete one task before moving on to the next one. Mr. Bennett was likewise pleased with his experience as Dr. Moran's patient, describing Dr. Moran as having done "a good job" on his neck. Finally, Mr. Bennett points to the results of Dr. Bluhm's April 2006, examination of him in which she placed him under a fifty pound lifting restriction, but did not determine that he was incapable of working.

These facts do not establish a genuine issue of material fact. Mr. Bennett did not point to any evidence indicating that Dr. Bluhm's evaluation or conclusion was not a reasonable medical judgment or that she failed to rely on the most current medical knowledge and/or the best available objective evidence. The comparisons Mr. Bennett attempted to draw between Dr. Bluhm's evaluation and those of Dr.

Moran and Dr. Landsberg do not demonstrate that Dr. Bluhm's evaluation fell below the standard of care, was inaccurate or drew erroneous conclusions.

Neither Dr. Moran nor Dr. Landsberg performed a holistic evaluation of Mr. Bennett as it related to his ability to continue to perform the essential functions of his job safely over time. Dr. Landsberg performed an IME for the purposes of a worker's compensation claim and Dr. Moran testified that he did not take into account Mr. Bennett's other injuries such as the carpal tunnel syndrome or his shoulder in determining what restrictions should be imposed on Mr. Bennett. In fact, Dr. Moran's testimony in Mr. Bennett's worker's compensation claim stemming from wrist and neck injuries confirms Dr. Bluhm's conclusions. Dr. Moran stated that "continuing work as a production employee at Nissan I think would also be a factor [in the degeneration process]" of the disks in Mr. Bennett's neck. When asked what he meant by this statement, Dr. Moran explained that the "repetitive lifting, pushing, twisting, overhead work" all place stress on the spine more than sedentary type of work such as a desk job.

In any event, assuming *arguendo* that the medical opinions of Dr. Moran and Dr. Landsberg differed from that of Dr. Bluhm, divergent medical opinions do not create disputes of fact where Mr. Bennett's argument is that Nissan should have followed the recommendation of one doctor over another. The Seventh Circuit addressed this issue directly in *Knapp v. Northwestern University,* 101 F.3d 473 (7th Cir.1996), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997), when it held that it was not the court's place to decide which of divergent medical opinions should be the final medical decision; rather that the court should "ensure that the exclusion or disqualification of an

individual was individualized, reasonably made, and based upon competent medical evidence" and that so long as these factors exist, "it will be the rare case ... where a court may substitute its judgment for that of the [Defendant's] physicians." 101 F.3d at 485.

Mr. Bennett suggests that it was not reasonable for Nissan to rely on the opinion of Dr. Bluhm because Nissan requested that she perform the CME, as opposed to Mr. Bennett requesting it independently, and implies that her conclusion was, therefore, predetermined by Nissan. Mr. Bennett offers Dr. Bluhm's April 2006, examination, in which she placed a 50 pound lifting restriction on him as evidence that her CME conclusions were predetermined by Nissan. Mr. Bennett did not, however, ask Dr. Bluhm to perform a CME-type or holistic evaluation in April 2006; instead he asked her to perform a physical evaluating his ability to primarily drive a truck. The merits of her comprehensive medical evaluation are not compromised by the results of her April 2006 examination, which was limited in scope and at which Mr. Bennett provided his medical history but did not inform her that she had evaluated him previously. Mr. Bennett testified that he believed Dr. Bluhm had already drawn her conclusions about his CME before evaluating him because she told him during the CME that Nissan had "put you through a lot of trauma." This is mere speculation on the part of Mr. Bennett and does not support his contention that her medical conclusions were predetermined by Nissan. Mr. Bennett also suggested that Nissan's reliance on Dr. Bluhm's CME conclusions was unreasonable because Nissan should have allowed him to seek his own doctor or at least provide input into the selection of a doctor to perform the CME as is done in workers' compensation claims; however,

there is nothing in the TDA, THRA or even the ADA that requires such.

Finally, Mr. Bennett contended that it was not reasonable for Nissan to rely on a CME when it could have done another type of evaluation, such as a functional capacity evaluation ("FCE"); however, Mr. Bennett offered no evidence to discredit or otherwise show why a CME was unreasonable. By contrast, Nissan presented evidence showing that a FCE or other similar evaluation was an inferior tool for determining an individual's future success in his or her job at Nissan, which was, among other things, one of the reasons Nissan established the CME program. Linda Eustice, a registered nurse who was employed by Nissan's human resources medical department in June 2005, testified in her deposition that Nissan owns and used FCE equipment in the context of workers' compensation claims, but that such evaluations had limited usefulness in predicting how successful someone would be returning to work. Ms. Eustice explained that a FCE is a "very limited" examination for the purpose of determining what someone could do at a specific point in time, like a "snap-shot;" consequently, it offered little insight into how a person would be able to handle the various tasks over an extended period of time.

In response to Nissan's evidence that it reasonably relied on the individualized medical assessment of Dr. Bluhm in determining that Mr. Bennett would be a direct threat to his own safety by continuing in his job as a production technician, Mr. Bennett offered nothing more than speculation that Dr. Bluhm was a "hired gun" for Nissan and raised no genuine issue of material fact as to whether Nissan acted reasonably in relying on its own doctors' medical advice.

Having affirmatively negated an essential element of Mr. Bennett's TDA claim by showing that Mr. Bennett was not "qualified" for the position from which he was removed because he would present a direct threat to his own safety by continuing to work in that position, Nissan is entitled to summary judgment. Because Nissan is entitled to summary judgment based on the second element of the TDA claim, we need not reach the third element of a TDA claim—whether a prohibited motivation was the sole reason for the adverse employment action.

## IV. Effect of Bennett's Acceptance of a Nissan Buy–Out

In March 2007, during the pendency of this action and while Mr. Bennett was still employed by Nissan as an employee on leave, Nissan offered all of its employees a voluntary termination program under which employees could voluntarily terminate their employment with Nissan in return for a lump sum payment. Because Mr. Bennett continued to be a Nissan employee on leave, he received a copy of Nissan's voluntary buy-out materials. On March 13, 2007, Mr. Bennett accepted Nissan's buy-out offer and he voluntarily resigned his employment from Nissan in exchange for a pre-tax lump sum payment of $58,000 effective March 30, 2007. By accepting Nissan's voluntary buy-out program, Mr. Bennett understood that he was ending his employment with Nissan and that he was not eligible for re-employment.

Nissan contended in its summary judgment motion that Mr. Bennett's voluntary resignation effectively cut-off his claim for lost wages and front pay as of March 30, 2007, the date he accepted the buy-out. Mr. Bennett did not dispute that the effect of his acceptance of the buy-out cut-off his claim, but he contended that the court should disregard the fact that he accepted

the buy-out because, according to Mr. Bennett, he felt financially "coerced" and only accepted Nissan's buy-out offer "under fraud or duress." Mr. Bennett testified in his deposition that "he chose to accept [Nissan's buy-out] offer because Nissan had refused to put him back to work and he needed the money." Nissan argued that Mr. Bennett failed to properly and timely raise the issue of fraud in the trial court because the first time Mr. Bennett mentioned that he had accepted the buy-out under duress was in his response to Nissan's statement of undisputed facts filed in support of Nissan's summary judgment motion.

This issue is pretermitted by our determination above that summary judgment for Nissan was proper; therefore, we do not reach the merits of the parties' arguments on this issue.

## CONCLUSION

For the foregoing reasons, we find the trial court erred in granting summary judgment based on the first element of Mr. Bennett's TDA claim—whether Mr. Bennett met the statutory definition of being "disabled;" specifically, we find a genuine issue of material fact exists as to whether Nissan regarded Mr. Bennett as substantially limited in the major life activity of working. However, because we find Nissan affirmatively negated the second element by showing that Mr. Bennett was not "qualified" for the position, we affirm the trial court's grant of summary judgment to Nissan on that ground. This case is remanded to the trial court for enforcement of the judgment and for the collection of costs assessed below.

Costs of appeal are taxed to Ritchie Bennett, for which execution may issue if necessary.