# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 8, 2010 Session

## GLADYS DAVIS v. NISSAN NORTH AMERICA, INC.

### Appeal from the Circuit Court for Rutherford County
### No. 58431      Robert E. Corlew, III, Chancellor

---

### No. M2009-02579-COA-R3-CV - Filed July 13, 2010

---

Gladys Davis ("Plaintiff") filed this retaliatory discharge case against her former employer, Nissan North America, Inc. ("Defendant"). Plaintiff claims Defendant retaliated against her for filing several workers' compensation claims. Prior to Plaintiff's discharge, she underwent a comprehensive medical examination and, based on this examination, two physicians who are board certified in occupational and preventive medicine opined that there was a high risk of re-injury should Plaintiff be returned to work. Relying on the medical opinions of these two physicians, Defendant filed a motion for summary judgment. The Trial Court concluded, among other things, that Defendant had negated an essential element of Plaintiff's claim and Defendant, therefore, was entitled to summary judgment as a matter of law. Plaintiff appeals, and we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
### Circuit Court Affirmed; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Sonya W. Henderson, Murfreesboro, Tennessee, for the Appellant, Gladys Davis.

Keith D. Frazier, Nashville, Tennessee, for the Appellee, Nissan North America, Inc.

# OPINION

## Background

This lawsuit was filed initially in state court in May of 2006. Plaintiff's original complaint alleged a violation of the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, as well as a claim for retaliatory discharge based upon her filing several workers' compensation claims. Plaintiff later amended her complaint to assert a claim pursuant to the federal Family Medical Leave Act, 29 U.S.C. § 2611. After removing the lawsuit to federal court, Defendant filed a motion for summary judgment. In October of 2008, the United States District Court for the Middle District of Tennessee entered a thorough memorandum opinion dismissing Plaintiff's FMLA claim with prejudice. As the federal court's memorandum opinion sets forth undisputed and important background and medical information, we will quote heavily from that opinion[1]:

> Nissan hired Davis as a production technician on September 8, 1991. Plaintiff described her job as production technician as "hard work," "physically demanding," "fast pace[d]," and repetitive in nature. Plaintiff was reassigned to the pre-final line where there are three to five jobs and each job is rated for its strenuousness. Each pod has the same range of high and low-rated jobs. A Nissan employee must be able to perform all jobs within a pod. Plaintiff's job involved "some pretty heavy lifting" and use of "some pretty big guns," with "a lot of overhead reaching and outstretching of her arms either "up or out."[2]
>
> By May, 2005, Plaintiff was assigned a carpet job [which] involved picking up the whole piece of carpet, cutting it in half, fitting the carpet in the vehicle, and attaching it with push pins. The pieces of carpet weighed approximately 12 pounds.

---

[1] Defendant placed much emphasis on the federal court's findings of fact when re-filing its motion for summary judgment in state court. The federal court's findings of fact essentially were restated in Defendant's statement of undisputed facts filed in support of its motion for summary judgment. Except as discussed later, Plaintiff admitted to the pertinent undisputed facts.

[2] While we are omitting the federal court's citations to the record, we note that any quotations from Plaintiff's testimony come from her pre-trial deposition.

In her first eleven years at Nissan, Plaintiff had several injuries, including on May 12, 1992, January 13, 1995, April 10, 1995, October 18, 1995, November 5, 1996, March 3, 1998, February 18, 1999, July 14, 2000, October 3, 2001, June 24, 2002, and August 15, 2002. . . .  Plaintiff had five additional work related injuries on April 13, 2003, March 11, 2004, April 1, 2004, November 3, 2004, and January 10, 2005. . . .  Plaintiff had four surgical procedures: on April 21, 2004 for her right wrist, on May 2, 2005 for her left wrist, on September 30, 2005 for her right elbow, and on June 20, 2005 for her right shoulder. . . . For these surgeries and various injuries, by November 28, 2005, Plaintiff had four work related leaves of absence totaling 320 days. . . .

As to her specific injuries, on May 19, 1992, Plaintiff complained of bilateral hand pain and numbness since May 12, 1992 due [to] "work[ing] on the engine line doing a lot of fine hand movements such as assembling pistons."  Nissan assigned Plaintiff restrictive work that avoided "heavy gripping or twisting [and] no power tools right hand for six days."

Dr. James K. Lanter, Plaintiff's physician diagnosed Plaintiff with "flexor tendonitis of both wrists with some symptoms of carpal tunnel syndrome while using her hands at work."  Dr. Lanter attributed Davis' numbness "to using her hands in a gripping fashion at work and placed Davis on modified duty of "avoid[ing] power tools and repetitive gripping." . . . Dr. Lanter released Davis to full duty on June 15, 1992. . . .  Upon her return, Nissan provided Plaintiff with an Impacto glove with a thumb pad for her left hand to decrease recurrence of her symptoms. . . . On December 22, 1992, Davis began a workers' compensation leave of absence until January 6, 1993.  On January 13, 1995, Davis reported right palm [pain] due to pushing and twisting cable brackets. . . .

On April 10, 1995, Davis reported a left pectoral strain, while she was leaning over in a vehicle performing the bumper deck job.  On September 14, 1995, Davis reported a right hand strain caused by repetitively pushing pins into the fender liner. Davis was told to "avoid repetitive use and pushing with [the]

-3-

extended fingers [of her right hand] for the rest of [the] day." On October 18, 1995, Davis reported a left shoulder strain resulting from lifting and "pulling down [on] the trunk of the cars," but returned to full duty.

On November 5, 1996, Davis reported a left hand strain caused by "using a heavy air gun for a long period of time," but returned to duty. On March 3, 1998, Plaintiff reported experiencing a foreign body in her right eye. On February 18, 1999, Plaintiff complained of suffering a right wrist contusion (pinky injury). Dr. Tony Adams placed Plaintiff on temporary restrictions, but later Plaintiff returned to work. . . .

On July 14, 2000, Plaintiff reported a thoracic strain with spasm resulting from "new job tools and [the] method of performing [her] job." Dr. Adams set lifting, stooping, bending, and twisting restrictions for Plaintiff. On October 3, 2001, Davis had a right wrist strain. Dr. Adams diagnosed as "thumb/wrist tendonitis," and placed Plaintiff on temporary restrictions, which Nissan accommodated.

On June 24, 2002, Davis suffered a left elbow sprain, but returned to duty. On August 15, 2002, Plaintiff sustained a right hand contusion, but returned to duty. On April 3, 2003, Plaintiff had an injury to her right wrist from "rapid stringing usage," and Dr. Adams diagnosed Plaintiff with right hand tendonitis. Dr. Adams also referred Plaintiff to Dr. David M. Schmidt of Tennessee Orthopaedic Alliance and placed Plaintiff on temporary restrictions that Nissan accommodated.

On October 30, 2003, Plaintiff reported to Nissan a medical recurrence of her right hand pain and stated that "[my] right hand has hurt the worst it has ever hurt over this past weekend, and I need something done about it." On November 3, 2003, Plaintiff was placed on temporary modified duty. Dr. Adams set restrictions on Plaintiff's use of her right hand. Plaintiff returned to work at Nissan on November 7, 2003, but also complained of pain after the modified duty. On December 2, 2003, Dr. Schmidt examined Plaintiff's right thumb and

conducted a bone scan for her right wrist on December 8, 2003 as well as a CT scan on January 14, 2004.

On January 9, 2004, Dr. Schmidt imposed temporary restrictions on Plaintiff's use of her right wrist. On January 20, 2004, Dr. Schmidt released Plaintiff to return to work full duty. On February 2, 2004, Davis reported to Nissan's medical clinic complaining of "severe pain" in her right hand and stating "I can't keep working like this." On February 6, 2004, Dr. Schmidt examined Plaintiff for wrist pain and restricted her use of her wrist . . . .

On February 24, 2004, Plaintiff reported to Nissan medical with "severe pain" in her right hand and stated that "she is using the left hand and right elbow more since she is guarding the right hand and now these other areas right elbow and left hand are hurting." On February 26, 2004, Plaintiff returned to Nissan's medical clinic again complaining of "severe pain" in her right hand. While "working on the line, Plaintiff felt a pop in the right hand and totally lost strength in her right hand with numbness and tingling." Dr. Schmidt placed Plaintiff on a ten day temporary restriction of "no power tools, no gripping and no push pull over 5 pounds or lifting over 5 pounds with the right hand."

Plaintiff then took workers' compensation leave of absence from February 27, 2004 through March 8, 2004. On March 22, 2004, Davis reported another injury to her right wrist and Dr. Schmidt placed Plaintiff on temporary leave.

On April 21, 2004, Dr. Schmidt performed surgery on Plaintiff's right hand and set Plaintiff's temporary restrictions on Plaintiff's use of her right hand. Plaintiff then began a workers' compensation leave of absence for 86 days until July 16, 2004. Dr. Schmidt continued to see Plaintiff for follow-up visits on May 25, 2004 and June 22, 2004. On August 4, 2004, Dr. Schmidt noted Plaintiff [had] "wrist soreness and swelling" and that "sometimes [she] can hardly turn the key in her car." Dr. Schmidt advised Plaintiff to continue wearing her wrist support and was concerned about "[r]eturning to repetitive use [that]

may cause continuation of symptoms." Plaintiff notes that prior to this visit, Nissan's physician had [told] her to stop wearing the wrist support.

On September 17, 2004, Plaintiff left a voice mail message with Nissan's medical clinic that her "wrist is hurting just as bad as it did before" and requested an earlier date for her next doctor's appointment. Dr. Schmidt examined Plaintiff on September 29, 2004 and noted "she still has pain in her right wrist which hurts when she does her regular job" and that this pain "goes up to her elbow." In response, Dr. Schmidt explained that Davis "has arthritic changes in her wrist" that causes the pain and that she had maximum recovery or improvement.

On November 3, 2004, Davis reported to Nissan medical that with "the same movement over and over" in "lifting glass [and] bending [and] twisting on wires," she suffered a right wrist strain. On November 9 and 16, 2004, Dr. McHugh examined Plaintiff for her wrist pain and advised Plaintiff to wear a splint while she slept and released her to return to work on November 16, 2004. On March 15, 2004, Davis sustained an injury to her left [hand]/wrist and on March 18, 2004, Dr. Woodberry diagnosed Davis with a ganglion cyst on her left hand and placed her on temporary restrictions. On March 22, 2004, Dr. Schmidt examined Plaintiff's right wrist and set temporary restrictions. On April 15, 2004, Dr. Woodberry examined Plaintiff's left wrist injury.

On June 10, 2004, Dr. Woodberry continued Davis' temporary restrictions for her left wrist and elbow. On July 15, 2004, Dr. Woodberry removed his restrictions on Davis' left wrist and Plaintiff returned to work on July 16, 2004. After Davis's return to work, Nissan assigned Plaintiff to a new work group for Maxima trim. Plaintiff wore an elbow brace, but reported to Nissan medical that her right elbow had "burning and sticking pain." In October, 2004 Davis underwent an MRI for her right elbow. On November 30, 2004, Dr. Schmidt noted that Davis "has failed conservative measures to date," and administered a cortisone shot, and imposed restrictions for ten

-6-

days. Davis returned to modified duty in December, 2004. On January 5, 2005, Plaintiff complained to Dr. Schmidt that her elbow pain had not completely resolved, but "settled . . . down." On January 10, 2005, Plaintiff reported a right shoulder strain that she attributed to "lifting overhead or up and over moving."

On March 2, 2005, Davis informed Nissan medical that "Dr. Schmidt gave me a cortisone shot in my elbow. It's still hurting." On April 11, 2005, Dr. Blake Garside, Jr., from workers' compensation panel of physicians examined Davis who reported that she had "approximately a three-month history of pain in her right shoulder" which she attributed to "doing repetitive work including overhead and outstretched lifting." Dr. Garside recommended "a short course of anti-inflammatories" as treatment. This treatment was not successful and Davis saw Dr. Garside on April 29, 2005, and reported that her right shoulder pain was "worse than previously." On March 17, 2005, Davis reported to Nissan medical that "I've got to have surgery. I'll do whatever it takes to get out of pain." On May 2, 2005, Dr. Woodberry performed surgery on Davis' left wrist and joint debridement and imposed restrictions on her work. Plaintiff also began another workers' compensation leave that extended 30 months.

On June 10, 2005, Plaintiff reported that her shoulder pain "recurred to the level it was previously," and elected to have shoulder surgery that Dr. Garside performed on June 20, 2005. On June 30, 2005, Dr. Woodberry released his restrictions for Davis's use of her left hand, but due to Dr. Garside's shoulder restrictions, Plaintiff did not return to work, and continued on her workers' compensation leave.

On August 25, 2005, Philip G. Coogan, M.D., of Tennessee Orthopaedic Alliance Hand Care, examined Plaintiff's elbow, and noted that Davis "has had injections for tennis elbow with transient benefit." On September 16, 2005, Dr. Garside placed temporary restrictions on Plaintiff until October 3, 2005. On September 30, 2005, Dr. Coogan performed surgery on Davis' elbow and she remained on restrictions. On October 28, 2005, Dr. Garside found Plaintiff

had reached maximum improvement on her right shoulder and assigned her a 10% rating to her right upper extremity. On November 9, 2005, Dr. Coogan placed right hand restrictions that Davis could not use power tools nor occasional gripping and twisting, and her push and pull was limited to up to five pounds. Dr. Coogan noted Davis as having a 2% impairment, Exhibit 73, but released Plaintiff to return to work with no restrictions for her right hand effective November 23, 2005.

*Davis v. Nissan North America, Inc.*, No. 3:06-1106, 2008 WL 4773116, at *1-5 (M.D. Tenn. Oct. 27, 2008) (citations to the record omitted).

After setting forth Plaintiff's extensive history of work-related injuries and the leave she received as a result of those injuries, the federal district court concluded that the undisputed material facts demonstrated that Plaintiff had received all of the leave she was entitled to under the Family Medical Leave Act and, therefore, Defendant was entitled to summary judgment on that claim. The federal district court declined to continue to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims, which were dismissed without prejudice. Plaintiff then re-filed her state law retaliatory discharge claim on February 3, 2009.[3] According to the complaint:

> Plaintiff . . . was employed by [Defendant] on or about September 8th, 1991, and had worked there continuously until her employment was terminated on or about March 31, 2006.

> Around March 31, 2006, the day Plaintiffs employment was terminated, her job title was "Technician" . . . .

> Plaintiff's employment record shows that she was a reliable employee with little or no history of absenteeism, and any absences were scheduled prior. Also, Plaintiff was fully qualified for her job duties as she was able to perform them with no accommodation. . . .

> Plaintiff . . . sustained a work-related injury to her right wrist on April 1, 2003, for which she was treated and released

---

[3] Plaintiff did not re-file her claim based upon the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103.

to full duty without restrictions on January 5, 2005. She was returned to work at Nissan full duty.

On March 11, 2004, Dr. Woodbury discovered a left dorsal wrist mass and ganglion cyst in her left hand, which she removed on May 2, 2005. She was then released to full duty without restrictions on June 30, 2005. She was not returned to work at Nissan for this injury.

Plaintiff sustained an injury to her right elbow on April 1, 2004, for which she was treated and released to full duty without restrictions on November 9, 2005. . . .

Plaintiff sustained an injury to her right shoulder on January 10, 2005, for which she had surgery and was released on November 28, 2005. Plaintiff was released to return to work at full duty.

After treatment and release of her shoulder injury, Plaintiff . . . expected to return to work on November 23, 2005. However, before allowing [Plaintiff] to return to work to her normal job duties, Defendant . . . required [Plaintiff] to be evaluated by Dr. Renata Bluhm on January 23, 2006.

[Plaintiff] met with Nissan representatives Patti Dixon, Lisa Batten, and Glen Lewis, and Esis representative Carolyn Lawson who encouraged her to apply for long-term disability due to the letter from Dr. Renata Bluhm. The content of the letter they relied on states to Nissan Medical director Dr. Karen Oldham, "For her own safety concern, due to the recurrent significant injuries that she has already experienced, it would probably pose a risk for her to continue in this line of work."

After this meeting with various Nissan representatives, Plaintiff was offered a voluntary severance package, which she refused. Plaintiff apparently sought disability benefits, but that claim was denied. Plaintiff was placed on leave and her employment was terminated on November 30, 2007 after all available leave had expired. In her complaint, Plaintiff maintained that the assertion of her rights pursuant to the Tennessee Workers' Compensation Act was the motivating factor in Defendant's decision to discharge her from active employment and was in retaliation for Plaintiff exercising her statutory rights.

Defendant has established a Comprehensive Medical Examination program ("CME program") in an attempt to avoid having employees continue to sustain injuries while performing their job duties. With regard to Defendant's CME program and how that program was utilized in Plaintiff's case, Plaintiff admitted to the following facts:

> Nissan's CME program was established in order to review whether employees who had sustained "multiple injuries and [had] multiple surgeries for multiple body parts," and who had been cleared by their attending physician to return to work would be able to safely continue performing their production jobs at Nissan on a long-term basis.

> Under Nissan's CME program, the CME committee decides who will undergo a comprehensive medical examination by an independent physician.

> Renata Bluhm, M.D., was chosen by Nissan to perform a comprehensive medical examination of employees. Dr. Bluhm is board-certified in internal, occupational, and preventive medicine.

> Dr. Bluhm's role was to examine the employee and evaluate her medical condition "holistically" taking into account all of the medical issues that the employee may have had in the past and then to make a medical determination as to whether the employee can successfully return to work in the long term. . . .

> In its review, the CME committee noted that [Plaintiff] "continues to experience upper extremity injuries including 7 work related leaves of absence" which resulted in excess of 320 leave of absence days. . . . The committee expressed the concern that should [Plaintiff] continue to work in production at full duty, this "may contribute to future new or exacerbation of past problems" and that "[h]er long term success [at Nissan] is a concern."[4] . . . Based upon [Plaintiff's] past history and concern for her long term success at Nissan, the CME

___

[4] Even though Plaintiff admitted to the CME committee's findings and that the statements attributed to the committee were made, etc., she repeatedly qualified her admission by noting that she had been returned to work full duty with no restrictions by her treating physicians.

-10-

committee requested [Plaintiff] undergo a "holistic" medical evaluation.

On January 23, 2006, Dr. Bluhm conducted her evaluation of [Plaintiff]. Bluhm reviewed [Plaintiff's] medical records and her job duties and performed a physical examination. . . . During the examination, Dr. Bluhm performed a number of tests. . . . [Plaintiff] informed Dr. Bluhm about the surgeries she had undergone, and that she had not been working since May, 2005. In that month, she had a ganglion cyst removed from her left hand, which [Plaintiff] attributed to "repetitive use of her hands." Prior to surgery, [Plaintiff] reported she had pain when putting any pressure on her left hand. [Plaintiff] also reported to Dr. Bluhm that she had a slight tear of the rotator cuff, which was caused by "a lot of lifting, repetitive lifting, lifting overhead" of items weighing five to ten pounds. . . . [Plaintiff] had additional problems with her elbow "caused by the lifting up," which was a "repetitive problem." [Plaintiff] had surgery for her right hand in 2004 because of "wear" from "repetitive usage" and which required a "ligament" repair.

Dr. Bluhm noted that [Plaintiff's] medical records evidenced "a history of multiple injuries, requiring multiple surgeries, which were attributable to the repetitive nature of the activities" in which [Plaintiff] had been engaged at work. . . . Dr. Bluhm found significant the fact that [Plaintiff] had "failed conservative treatment for the injuries that eventually required surgery." Nissan also had allowed [Plaintiff] to work "in job-modified situations," but she continued to suffer reinjury. . . . In assessing [Plaintiff's] ability to return to work at Nissan, Dr. Bluhm noted that "her work duties will include multiple activities for all her body areas" and that [Plaintiff's] current job duties remain essentially 'repetitive' and these are the activities that she relates have led to her present injuries which required surgical treatment. . . . Dr. Bluhm determined that [Plaintiff] would be considered in the "high" category in terms of certainty of an adverse outcome and the "high" category in terms of the

severity of the outcome.[5] Dr. Bluhm wrote in her January 23, 2006 report to Nissan's on-site medical director, Karen Oldham, M.D., that "[c]onsidering that she has had multiple injuries, four of which required surgery for correction and resolution of 'severe pain,' her likelihood of re-injury is considerable." . . . Dr. Bluhm advised Dr. Oldham that "[f]or her own safety concern" and "due to her recurrent significant injuries that she had already experienced," it would pose "a risk for her to continue" her job at Nissan.

Nissan's on-site medical director, Dr. Karen Oldham, M.D., is board certified in preventive medicine with a specialty in occupational and environmental medicine and has a master's degree in business administration. . . . Dr. Oldham had the responsibility for making the recommendation as to whether an employee who had undergone a [CME] should return to work. . . . It was a "medical call" for Nissan's medical director to make. . . . As Dr. Oldham explained, "[i]t is a professional judgment based on medical and statistical probabilities of what we know about people who undergo surgery, who have sustained previous injuries and whether or not they are at a low or a high risk. In [Plaintiff's] case, Dr. Oldham made her evaluation and . . . [recommended] that [Plaintiff] should not return to work because she was at very high risk of future injury. Dr. Oldham met with [Plaintiff] on January 25, 2006 and discussed the results of Dr. Bluhm's examination. Dr. Oldham informed [Plaintiff] that based upon Dr. Bluhm's report and the fact that her pattern of multiple injuries from repetitive work puts [Plaintiff] at high risk of future injury, it would not be safe to return to her job at Nissan.

As noted previously, once this case was re-filed in state court, Defendant again filed a motion for summary judgment claiming that the undisputed material facts demonstrated that it was entitled to summary judgment as a matter of law. The Trial Court agreed, concluding that Defendant had negated an essential element of Plaintiff's claim and that Plaintiff had failed to establish the requisite causal connection between her filing of workers' compensation claims and her termination from employment. Alternatively, the

---

[5] Again, while Plaintiff disagrees with Dr. Bluhm's conclusions, she admits that Dr. Bluhm did reach these conclusions. The same can be said for the conclusions reached by Dr. Oldham.

Trial Court found that even if Plaintiff had established some sort of causal connection, Defendant nevertheless established a neutral basis for terminating Plaintiff's employment, i.e., two physicians who are board certified in occupational medicine determined that Plaintiff's physical condition "was such that it was unsafe for her to return to her former job." Accordingly, the Trial Court granted Defendant's motion for summary judgment. Plaintiff appeals asserting that granting Defendant summary judgment was error.

## **Discussion**

Our Supreme Court reiterated the standard of review in summary judgment cases as follows:

> The scope of review of a grant of summary judgment is well established. Because our inquiry involves a question of law, no presumption of correctness attaches to the judgment, and our task is to review the record to determine whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Cent. S.*, 816 S.W.2d 741, 744 (Tenn. 1991).

> A summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993). The party seeking the summary judgment has the ultimate burden of persuasion "that there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." *Id*. at 215. If that motion is properly supported, the burden to establish a genuine issue of material fact shifts to the non-moving party. In order to shift the burden, the movant must either affirmatively negate an essential element of the nonmovant's claim or demonstrate that the nonmoving party cannot establish an essential element of his case. *Id*. at 215 n.5; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8-9 (Tenn. 2008). "[C]onclusory assertion[s]" are not sufficient to shift the burden to the non-moving party. *Byrd*, 847 S.W.2d at 215; *see also Blanchard v. Kellum*, 975 S.W.2d 522, 525 (Tenn. 1998). Our state does not apply the federal standard for summary judgment. The standard established in *McCarley v. West Quality Food*

*Service*, 960 S.W.2d 585, 588 (Tenn. 1998), sets out, in the words of one authority, "a reasonable, predictable summary judgment jurisprudence for our state." Judy M. Cornett, *The Legacy of Byrd v. Hall: Gossiping About Summary Judgment in Tennessee*, 69 Tenn. L. Rev. 175, 220 (2001).

Courts must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). In making that assessment, this Court must discard all countervailing evidence. *Byrd*, 847 S.W.2d at 210-11. Recently, this Court confirmed these principles in *Hannan*.

*Giggers v. Memphis Housing Authority*, 277 S.W.3d 359, 363-64 (Tenn. 2009).

In *Anderson v. Standard Register Co.*, 857 S.W.2d 555 (Tenn. 1993), the Supreme Court set forth the various elements a former employee must prove in order to establish a claim for retaliatory discharge based upon the filing of a workers' compensation claim. According to the Court:

the following elements are found to establish a cause of action for discharge in retaliation for asserting a workers' compensation claim: (1) The plaintiff was an employee of the defendant at the time of the injury; (2) the plaintiff made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated the plaintiff's employment; and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment.

The burden of proof rests, of course, upon the plaintiff to prove the elements of the cause of action, including a causal relationship between the claim for workers' compensation benefits and the termination of employment. Proof of discharge without evidence of a causal relationship between the claim for benefits and the discharge does not present an issue for the jury.

-14-

However, proof of a causal link between the claim for benefits and the employee's discharge imposes upon the employer the burden of showing a legitimate, non-pretextual reason for the employee's discharge. As stated in 2A A. Larson, *The Law of Workmen's Compensation*, § 68.36(d), pp. 188-191 (1990):

> Once the employee has made a *prima facie* case of retaliation, the burden devolves upon the employer of proving a legitimate nonpretextual nonretaliatory reason for the discharge. The reason may involve the employee's own shortcomings, such as unexplained tardiness, excessive absenteeism, lying as to previous compensation claims, or physical inability to do the job. . . .
>
> In this case, the plaintiff presented no evidence that her assertion of a claim for workers' compensation benefits was a factor in causing her discharge. . . . There is no evidence in the record of this case on which to submit the issue of causation to a trier of fact. Accordingly, the judgment for the employer is affirmed.

*Anderson*, 857 S.W.2d at 558-59.

In a factually similar case, a former employee of Nissan filed suit after he was not returned to work following a CME evaluation by Dr. Bluhm. *Bennett v. Nissan North America, Inc.*, No. M2008-01019-COA-R3-CV, 2009 WL 837726 (Tenn. Ct. App. Mar. 27, 2009), *perm. app. denied Nov. 23, 2009*. While factually very similar to the present case, *Bennett* involved a claim pursuant to the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103 (the "TDA"), as opposed to a claim for retaliatory discharge for filing a workers' compensation claim. In any event, the relevant facts in *Bennett* showed that:

> Mr. Bennett's CME was conducted by Dr. Renata Bluhm, the medical director of OccuPatient. Dr. Bluhm reviewed Mr. Bennett's medical records and the job requirements in the trim and chassis department where Mr. Bennett most recently worked. She obtained a medical history from Mr. Bennett and conducted a physical examination, observing that Mr. Bennett had several well-healed scars on his neck, right shoulder, right wrist, and left palm, but that he had "good range of motion in his

back, neck and shoulders with good strength throughout." Dr. Bluhm's CME concluded, however, that "the activities that have led to [Mr. Bennett's] injuries will continue if he were to return to work." She concluded that "[f]or his own safety concern, due to his recurrent significant injuries, it would probably pose a risk for him to continue in this line of work. It would probably not be safe for him to resume these duties." Dr. Karen Oldham, the director of Whole Health, Nissan's on-site medical provider, reviewed Dr. Bluhm's report and determined that Mr. Bennett should not return to work as a Nissan production technician.

* * *

On December 8, 2005, Mr. Bennett sent a certified letter to Nissan to the attention of Mr. Glen Lewis, Nissan human resources section manager, requesting that Nissan allow him to return to work. In the letter, Mr. Bennett stated that his treating physician, Dr. Moran, had released him to full duty without restrictions and that he felt that he was able to return to work. Mr. Bennett sent another letter stating essentially the same thing to the attention of Ms. Linda Eustice, a human resources specialist for Nissan, on January 7, 2006. On January 11, 2006, Dr. Oldham responded to Mr. Bennett on behalf of Nissan by letter stating that "repetitive work in heavy industry is not an appropriate job for you. Every time we fix one of your injuries and you are released without restrictions, you develop another injury." Dr. Oldham's letter informed Mr. Bennett that Nissan could not allow him to return to work because he could not safely continue to perform his job duties.

*Id*., at *2, 4. In affirming the grant of summary judgment to Nissan, this Court stated, among other things, that:

Dr. Bluhm, who conducted the holistic evaluation of Mr. Bennett, determined that he had experienced "significant and recurrent injuries" that required surgery and that, "despite surgical repair, he has had recurrent injury requiring a second surgery of the neck and recurrent pain of the right shoulder." *See* 29 C.F.R. § 1630.2(r)(1), (2). Dr. Bluhm concluded that if Mr. Bennett were to return to his job as a production technician,

-16-

"his injuries will continue." *See* 29 C.F.R. § 1630.2(r)(3). Dr. Bluhm wrote in her report to Nissan's on-site medical director, Dr. Oldham, that "[f]or his own safety concern" and "due to his recurrent significant injuries," it would pose "a risk for him to continue" his job at Nissan. *See* 29 C.F.R. § 1630.2(r)(2), (3). Based on Dr. Bluhm's evaluation and the fact that Mr. Bennett had sustained numerous injuries as a result of performing the job of production technician, Dr. Oldham determined that it would not be safe for Mr. Bennett to return to his job at Nissan and she notified Nissan management that he should not be allowed to return to his job duties as production technician. In response to Mr. Bennett's December 2008, letter requesting permission to return to work, Dr. Oldham wrote to Mr. Bennett that "repetitive work in heavy industry is not an appropriate job for you," and that "every time we fix one of your injuries and you are released without restrictions, you develop another injury." We find Nissan presented sufficient evidence to negate an essential element of Mr. Bennett's TDA claim - that Mr. Bennett was "qualified" for the position of production technician at Nissan - because Nissan determined through an individualized assessment based on reasonable medical advice that he presented a direct threat to his own safety if he continued working in the position.

* * *

[A]ssuming arguendo that the medical opinions of Dr. Moran and Dr. Landsberg differed from that of Dr. Bluhm, divergent medical opinions do not create disputes of fact where Mr. Bennett's argument is that Nissan should have followed the recommendation of one doctor over another. The Seventh Circuit addressed this issue directly in *Knapp v. Northwestern University*, 101 F.3d 473 (7th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997), when it held that it was not the court's place to decide which of divergent medical opinions should be the final medical decision; rather that the court should "ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence" and that so long as these factors exist, "it will be the rare case . . . where a court may substitute

its judgment for that of the [Defendant's] physicians." 101 F.3d at 485.

\* \* \*

In response to Nissan's evidence that it reasonably relied on the individualized medical assessment of Dr. Bluhm in determining that Mr. Bennett would be a direct threat to his own safety by continuing in his job as a production technician, Mr. Bennett offered nothing more than speculation that Dr. Bluhm was a "hired gun" for Nissan and raised no genuine issue of material fact as to whether Nissan acted reasonably in relying on its own doctors' medical advice.

Having affirmatively negated an essential element of Mr. Bennett's TDA claim by showing that Mr. Bennett was not "qualified" for the position from which he was removed because he would present a direct threat to his own safety by continuing to work in that position, Nissan is entitled to summary judgment. Because Nissan is entitled to summary judgment based on the second element of the TDA claim, we need not reach the third element of a TDA claim-whether a prohibited motivation was the sole reason the adverse employment action.

*Bennett*, 2009 WL 837726, at \*20, 21.

We acknowledge that *Bennett* is not directly on point because that case involved a TDA claim and the Court relied, in part, upon federal law applying the Americans with Disabilities Act. Nevertheless, there are important similarities. For example, a TDA claim involves a very similar burden-shifting analysis that also is present in a workers' compensation retaliatory discharge case. In addition, in both cases the same employer was relying upon the medical opinions of Drs. Bluhm and Oldham to defeat a claim by a former employee surrounding the reason for the employee's termination. Even though *Bennett* is not directly on point, we conclude that much of the rationale applied in *Bennett* applies equally to the claim at issue in the present case.

In response to the motion for summary judgment, Plaintiff relied on the fact that she had been released by her treating physician to return to work with no restrictions. Plaintiff also relied on the affidavit of Dr. David Gaw, who opined that based on his medical evaluation of Plaintiff, she was not at risk for harm if she returned to work at Nissan. Dr.

Gaw examined the Plaintiff on July 16, 2008, over two years after Plaintiff claims her employment was terminated. The Trial Court concluded that even though Dr. Gaw was a competent witness, he was not board certified in occupational medicine. "Even so, his subsequent opinion in contradiction to that of the two physicians presented by the Defendant does not justify a finding that the reason of the company was pretextual."

We agree with the Trial Court that Plaintiff being released to return to work with no restrictions, coupled with the affidavit of Dr. Gaw generated two years after Plaintiff's employment was terminated, are insufficient to create a disputed issue of material fact regarding whether Defendant's stated reason for terminating Plaintiff was pretextual. Nissan was fully justified in relying on the professional medical opinions of two physicians who are board certified in occupational and preventive medicine. *See Bennett*, 2009 WL 837726, at * 21 ("[D]ivergent medical opinions do not create disputes of fact where Mr. Bennett's argument is that Nissan should have followed the recommendation of one doctor over another.").

We further agree with the Trial Court's judgment that Nissan affirmatively negated one of the essential elements of Plaintiff's claim, i.e., that "the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate the employee's employment." *Anderson*, 857 S.W.2d at 558. There is no evidence in the record that Plaintiff's filing of workers' compensation claims played any role whatsoever in the decision not to return her to work. The prohibition against retaliating against employees who file workers' compensation claims does not guarantee an employee the right to return to work when such return poses a high risk of re-injury. Stated another way, the prohibition against retaliation does not guarantee employees the right to return to work and to continue re-injuring themselves until they are so disabled that they are permanently and totally disabled and can never work again.

The undisputed material facts establish that Nissan did not return Plaintiff to work because of the high likelihood of re-injury. This in no way is retaliatory based upon Plaintiff's having filed workers' compensation claims. It also constitutes a "legitimate nonpretextual nonretaliatory reason for the discharge." *See Anderson*, 857 S.W.2d at 559. The Trial Court's award of summary judgment to Defendant is affirmed. Any remaining issues are pretermitted.

## Conclusion

The judgment of the Trial Court is affirmed and this cause is remanded to the Rutherford County Circuit Court solely for collection of the costs below. Costs on appeal are taxed to the Appellant, Gladys Davis, and her surety, for which execution may issue, if necessary.

_____
D. MICHAEL SWINEY, JUDGE