IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 14, 2016 Session

**LAURA LEE DEMASTUS v. UNIVERSITY HEALTH SYSTEM, INC.**

**Appeal from the Circuit Court for Knox County**
**No. 3-554-14      Deborah C. Stevens, Judge**

_____

**No. E2016-00375-COA-R3-CV-FILED –MARCH 2, 2017**

_____

Plaintiff Laura Lee Demastus brought this action against her former employer, University Health System, Inc., doing business as the University of Tennessee Medical Center (Employer).  After Plaintiff had worked roughly three years as a nurse at the UT Medical Center, Employer suspected that she was illegally diverting medications.  When Plaintiff's supervisors confronted her with evidence of several suspicious transactions recorded by the medication monitoring systems, Plaintiff denied doing anything wrong or improper.  She, however, could not explain the suspicious transactions.  She was terminated shortly thereafter.  Plaintiff brought this action under the Tennessee Disabilities Act (TDA), Tenn. Code Ann. § 8-50-103 _et seq._ (2016), alleging that she was fired solely because Employer perceived her to have the disability of drug addiction.  Employer argued that it did not fire her because she was considered a drug addict, but because it thought she was stealing medications.  Following discovery, the trial court granted summary judgment, holding that under the undisputed material facts, Plaintiff could not establish that Employer's proffered non-discriminatory reason was a pretext for illegal discrimination.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Katherine A. Young, Knoxville, Tennessee, for appellant, Laura Lee Demastus.

Howard B. Jackson, Knoxville, Tennessee, for appellee, University Health System, Inc. dba University of Tennessee Medical Center.

1

# OPINION

## I.

Plaintiff began working for Employer at the UT Medical Center in June 2010. According to her employment record and supervisors' testimony, she was an excellent employee by some measures, and was a diligent worker and a caring and conscientious caregiver. She had a tardiness problem at times, which, according to her, was caused by her Attention Deficit Hyperactivity Disorder diagnosis. Plaintiff's complaint alleges that "[a]s a result of Plaintiff's ADHD, she was often late for obligations. In early 2013, Plaintiff was warned that her tardiness was unacceptable at [Employer's] workplace and she corrected her behavior."

Kimberly New worked for Employer as a compliance officer, monitoring medication administration in an attempt to prevent employee diversion, which she testified "has become a significant issue in hospitals." In August 2013, New investigated Plaintiff's medication administration transactions. Her affidavit describes her investigation:

> If I became aware of medication administration transactions that raised concerns, I followed a typical investigative procedure. I obtained data on transactions from Omnicell reports, often for a period of 60 to 90 days. The Omnicell is a system that records when nurses remove medication. The Omnicell software records the identity of the nurse, the type of medication, the time it was removed, and the identity of the patient who was to receive the medication. I compared data from the Omnicell with information in patient charts, which is recorded electronically, to determine whether there were discrepancies or other troubling indications.

> \*       \*       \*

> I found several concerning transactions in the review of [Plaintiff's] medication administration transactions. Exhibit B to my affidavit . . . show[s] one example. In this instance, the Omnicell report shows a withdrawal of Oxycodone for patient GB at 22:28 on July 8, 2013. The patient chart does not record that dose of Oxycodone as having been

2

administered or wasted.[1]  I noted that this was a missing medication by writing an "m" with a circle around it next to the record of withdrawal on the Omnicell report.

\*     \*     \*

After I analyzed the medication administration records for [Plaintiff], I contacted her manager, Laura Harper.  Ms. Harper and I met with [Plaintiff] on August 28, 2013.  I presented [Plaintiff] with records of several concerning transactions.  She could not explain them.

\*     \*     \*

I met with Ms. Harper, and her supervisor, Jeanne Wohlford, on or about August 29, 2013, to discuss the investigation.  I showed documents to Ms. Harper and Ms. Wohlford and explained the facts revealed in the investigation.  Those facts pointed to the conclusion that [Plaintiff] had engaged in diversion of medication.  I was not asked for my opinion regarding [Plaintiff's] employment with the Hospital, nor did I offer an opinion on that subject.

(Numbering in original omitted; footnote added.)  In addition to the missing oxycodone noted above, New provided two other documented examples of concerning medication transactions in her affidavit.

Plaintiff testified as follows about the meeting on August 28, 2013:

Q. Was there discussion of occasions when medication was documented as being removed from the Omnicell but then not charted as being given to the patient?  Was that something that Ms. New mentioned?

A. Yes, she did.  She asked me if I could explain situations in which medications were removed but she could not find it in the charting where they had been administered, to which I responded, "If I removed the medication from the Omnimed or Omnicell, I either administered it to the patient or I

---

[1] Not usable.

3

returned it to the Omnimed or Omnicell. If the charting doesn't reflect that, I have no explanation as to why that is. I'm not an IT person. I'm a nurse, but all I can tell you is what I know to be the truth, which is if I removed it, I either gave it or returned it, period."

Q. Did Ms. New or Ms. Harper respond when you made that comment?

A. They responded by continuing to go down the list of medications that Ms. New had compiled to see if I had an explanation for any of the discrepancies that she had come across.

Q. Did Ms. New make mention of a discrepancy such as medication documented as being administered to a patient before it had been documented as being removed from the Omnicell?

A. I believe that there was one instance, maybe more, of something of that. Sitting there, I was so in shock of what was being alluded to and what we were discussing, it was all very confusing for me, as far as how could it be that I administered medication that hadn't been pulled from an Omnimed before? I mean, how do I even procure medication unless it's through the Omnimed?

I was in such shock and in such a twirl mentally about the whole scenario that I didn't have the wherewithal to say, "I need to see charts, I need to see my notes, I need to see this, that and the other," and so with the limited amount of information that I had there, I just went with the truth and said, "If it says I removed it, I removed it, and I gave it or I returned it. That's all I can tell you."

Plaintiff testified that she assured her supervisors she did not have a drug abuse problem. She also consented to a drug screen. Before the results of the drug screen came back, Employer terminated Plaintiff's employment on August 30, 2013. The reason stated on Employer's supervisor separation evaluation form is "gross misconduct."

4

Plaintiff filed this action on August 26, 2014. She alleged that although she does not and has not ever had a drug addiction, Employer perceived her to have one, and fired her solely for that reason. In its answer, Employer denied a discriminatory intent, stating: "University Health did not regard Plaintiff as disabled. University Health regarded Plaintiff as a person who had diverted prescription medication."

Employer moved for summary judgment. Following a hearing, the trial court granted the motion, stating in pertinent part:

> [The TDA] requires the plaintiff to prove that [she was] terminated solely because of the disability. I think everybody this morning agreed that if the plaintiff had been terminated solely because of addiction she would have a disability claim. For purposes of reviewing this motion for summary judgment, the court has presumed plaintiff can make a prima facie case of disability.
>
> What the court has focused on is whether or not once the defendant has presented a business reason for the termination, whether or not the plaintiff can . . . meet [her] burden of proof in showing that the termination was pretextual.
>
>       \*      \*      \*
>
> I can't help but find that the basis for the termination was, in fact, drug diversion, that [Plaintiff] was given an opportunity as per standard protocol to explain the discrepancies. She chose to explain it by basically admitting that the records are what the records are.
>
>       \*      \*      \*
>
> And in this case, clearly, while there may have been discussions about what caused the medicine diversion of – discrepancy, the fact is that the plaintiff was terminated for medication diversion, which was a violation of the drug-free workplace, not in the sense of the fact that she was using the medicine, but in the sense that she had medication that was not accounted for.
>
>       \*      \*      \*

5

[T]he motion for summary judgment is properly taken and should be granted on the basis that, as a matter of law, the plaintiff cannot establish that the reasons for termination were pretextual particularly as set out in [Plaintiff's] deposition. No reasonable minds could differ on the factual conclusions.

Plaintiff timely filed a notice of appeal.

## II.

Our standard of review of a grant of summary judgment is as stated by the Supreme Court:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness.
>
> *     *     *
>
> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015) (emphasis in original).

In making the determination of whether summary judgment was correctly granted,

[w]e must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. ***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008); ***Luther v. Compton***, 5 S.W.3d 635, 639 (Tenn. 1999); ***Muhlheim v. Knox Cnty. Bd. of Educ.***, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See **White v. Lawrence***, 975 S.W.2d 525, 529 (Tenn. 1998); ***McCall v. Wilder***, 913 S.W.2d 150, 153 (Tenn. 1995).

***Wells Fargo Bank, N.A. v. Lockett***, No. E2013-02186-COA-R3-CV, 2014 WL 1673745 at *2 (Tenn. Ct. App., filed Apr. 24, 2014).

## III.

Plaintiff brought her employment discrimination action under the TDA, Tenn. Code Ann. § 8-50-103 *et seq.* (2016). The TDA states that "[t]here shall be no discrimination in the hiring, firing and other terms and conditions of employment . . . against any applicant for employment based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." *Id.* § 8-50-103(b). The analytical framework for addressing such a claim is found at Tenn. Code Ann. § 4-21-311(e) (2015), which provides:

In any civil cause of action alleging a violation of this chapter or of § 8-50-103, the plaintiff shall have the burden of establishing a prima facie case of intentional discrimination or retaliation. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the challenged employment action. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination or retaliation raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the challenged employment action and that the stated reason was a pretext for illegal discrimination or

7

retaliation. The foregoing allocations of burdens of proof shall apply at all stages of the proceedings, including motions for summary judgment. The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination or retaliation.

As we have observed, in order to establish a prima facie case,

> there are three elements to a claim for discrimination under the TDA; a claimant must show: "(1) that the individual was qualified for the position; (2) that the individual was disabled; and (3) that the individual suffered an adverse employment action because of that disability." *Barnes* [*v. Goodyear Tire & Rubber Co.*], 48 S.W.3d [698], 705 [Tenn. 2000, *abrogated on other grounds by* *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010)]. The third element, or causation element, may be established by either direct or indirect evidence of discrimination. *Id*. at 710. The threshold issue, however, is whether the claimant is "disabled." *Barnes*, 48 S.W.3d at 709–710; *Cecil v. Gibson*, 820 S.W.2d 361, 365 (Tenn. Ct. App. 1991).

*Bennett v. Nissan N. Amer., Inc.*, 315 S.W.3d 832, 841 (Tenn. Ct. App. 2009).

Although the TDA does not expressly define "disability," it "embodies the rights and definitions of the THRA [Tennessee Human Rights Act]," *id.*, and the THRA's definition of "disability" has been adopted and applied in TDA cases. *Id.*; *Barnes*, 48 S.W.3d at 706; *McConnell v. Armed Servs. Mut. Benefit Ass'n*, No. M2015-01184-COA-R3-CV, 2016 WL 3575012, at *4 (Tenn. Ct. App., filed June 24, 2016); *Jones v. Sharp Elec. Corp.*, No. W2013-01817-COA-R3-CV, 2014 WL 806131, at *3 (Tenn. Ct. App., filed Feb. 28, 2014) ("[T]he definition [of "disabled"] contained in the Tennessee Human Rights Act ("THRA") is applicable to TDA claims."). The THRA provides:

> "Disability" means, with respect to a person:
>
> (i) A physical or mental impairment that substantially limits one (1) or more of such person's major life activities;
>
> (ii) A record of having such an impairment; or
>
> (iii) Being regarded as having such an impairment;

8

(B) "Disability" *does not include current, illegal use of, or addiction to, a controlled substance* or controlled substance analogue[.]

Tenn. Code Ann. § 4-21-102(3)(A) (2015) (emphasis added).

Plaintiff asserts in her affidavit: "I am not now, and have never been, a drug abuser or addict." Thus, she does not allege that she has a disability, but that Employer regarded or perceived her as having one, and fired her solely for that reason. Such a claim, if proven, would be actionable under the TDA. Tenn. Code Ann. § 4-21-102(3)(A)(iii); *Barnes*, 48 S.W.3d at 707 (the TDA "prohibits an employer from terminating an employee for a perceived disability or handicap"); *Bennett*, 315 S.W.3d at 846-47.

Plaintiff points to testimony indicating that her supervisors had a concern that she might be suffering from drug addiction. She stated in her deposition that at the August 28 meeting,

A. [New] went on to say that it's not uncommon for night nurses to have trouble sleeping. She sees it every day. She monitors medication, that's her only job, and nurses that you would never think have a substance abuse problem – there's no telltale sign, but it would behoove me to tell them whatever medications I'm on, any sort of substance abuse problem I have so that they can help me to get the assistance that I need.

Q. This is Ms. New talking?

A. Yes. Yes.

Q. How did you respond to her, or did you?

A. Well, I understood what her job for the hospital was, and I understood her role in safety. I also knew that I was not someone who had a substance abuse problem, and so I didn't want her to feel like I was not hearing her or being obstinate, but at the same time I wasn't going to admit to something that I knew to be untrue. Then she went on to talk about my co-worker and friend who was terminated for drug diversion.

9

Q. Who was that?

A. His name was [RH].

Q. Mr. H[] was terminated for diversion; is that your understanding?

A. That was my understanding. I'm not 100 percent sure.

           \*       \*       \*

Q. Did Ms. New make some comment to indicate a belief that you had been diverting medication?

A. Only so much as to say that she – if – that I needed to tell them what medications I was taking so that she could get me the help I needed. I didn't have a prescription for anything other than what I had told them. So if I had a substance abuse problem, I would have had to divert it. So it was sort of a roundabout way of getting there, but – and then she proceeded to have the LabCorp drug screen me.

           \*       \*       \*

Q. Did you reference diverting medication by saying, "I wouldn't divert medication because" –

A. I'm not sure I ever used the word "divert," because at that point I felt there was a larger issue at hand.

Q. Which was?

A. A concern about a substance abuse problem, and the mention of [RH] seemed to set up like a birds-of-a-feather situation.

A second meeting took place on August 30, 2013. Plaintiff, her supervisor Harper, and Employer's associate director for human resources, Brenda Merhar, were there. Plaintiff testified as follows about what happened at that meeting:

Q. How did that meeting begin?

10

A. Ms. Harper told me that Ms. New had continued to investigate and that she had found even more discrepancies or medications that weren't administered timely or couldn't be accounted for, and she asked me if I had an explanation for the new findings.

Q. How did you respond?

A. I said that all I knew was that if I pulled medication, I either gave it or I returned it, and to try to explain why the computer charting or whatever didn't reflect that, that was outside of my scope. I can't –

Q. How did Ms. Harper respond at that point?

A. She said that they've come to the conclusion that I'm now going to be terminated for gross misconduct per the drug-free workplace policy, that I would no longer have access to insurance, paid time off, and that I would be reported to the State and to TnPAP.[2]

Q. Do you remember your response?

A. I – all of the air sort of left the room, as far as I was concerned, and I said, "Well, what about my drug test? Have the results of my drug test come back yet?" And Ms. Merhar said, "We don't need to wait for the results of your drug test and, further, you need to do exactly what TnPAP says if you want to keep your license and work again as a nurse when they call you."

Merhar testified as follows regarding the decision to have Plaintiff tested for drugs and to refer her to TnPaP:

Q. If somebody stole money or products, you said they didn't do reasonable suspicion drug testing; correct?

A. Yes.

_____

[2]    TnPaP is the Tennessee professional assistance program, described by Plaintiff as "the healthcare practitioner drug rehabilitation program."

11

Q. But if they were suspected of stealing drugs, why would you do reasonable suspicion testing?

A. Because they could be using the drugs or stealing the drugs.

Q. In this particular case, some physical items are noted, specifically if you see in the box marked Number 6, eyes, it says, blood shot. Do you know why this would be something of significance to note for the Reasonable Suspicion form?

A. It is just one of the signs that a supervisor or department manager would look for if they thought the person was abusing drugs.

*        *        *

Q. Who decides that an employee at the University Hospital will be referred to TnPAP?

A. The department manager or supervisor.

Q. Do you have any input as to whether that referral is made or not?

A. HR would be consulted.

Q. Do you recall being consulted in regard to [Plaintiff]?

A. Well, we report all drug related things to TnPAP.

Q. Why is that?

A. Because they're the governing board for the nurses.

Q. When you say all drug related, what do you mean by all drug related? What types of cases?

A. Terminations.

Q. Terminations. But how are they related to drugs?

12

A. Either diversion or suspected use or positive drug test.

Q. Why would diversion be reported to TnPAP?

A. That's just – that's part of our procedure.

Q. Do you know why it's part of your procedure?

A. Because it was theft.

Q. And my understanding of TnPAP's purpose is to assist impaired professionals. Is that your understanding?

A. Yes.

Q: Why would theft require the assistance of a unit that's designed to assist impaired professionals?

A. It was our process that if anyone was terminated involving drugs that they would be reported to TnPAP, and then TnPAP could make their decisions.

Plaintiff relies upon the following statement from her affidavit: "when I was in the meeting with Kimberly New and Laura Harper on August 28, 2013, Laura Harper said to me that she had always worried about me because I fit the profile of the kind of nurse who would become addicted to drugs, because I was an over-achiever, conscientious, hard-working and always striving to provide a high standard of care for her patients." Plaintiff proffered a copy of an email sent from New to Merhar on August 29, 2013, which states in pertinent part:

> Laura Harper and I met last evening with [Plaintiff] to discuss several missing controlled substances as well as several medication handling issues. I informed [her] of the reason for the meeting and let her know that her drug transactions were quite concerning. . . . [Plaintiff] was cooperative but did not have an explanation for any of the missing medications, including a missing hydrocodone from the night before. Several times she stated she would never handle drugs in a certain way, but the evidence was there in front of her showing she did.

13

Specifically there were multiple doses of benzodiazepines and opioid tablets that [Plaintiff] removed from the drug cabinet but never documented administering to a patient. She admitted that she had a "bad habit" of pulling pain medications at the beginning of a shift when she knew her patient would be requesting them around the clock. She also admitted to carrying the medications around in her pockets. I informed her that both practices were a security issue and a violation of our drug handling policies.

*　　*　　*

I went through numerous transactions with [Plaintiff] and explained that we were doing so in order for her to understand the scope of the problem.

*　　*　　*

I left after the drug screen and encouraged [Plaintiff] to confide in Laura Harper about what was going on. I told [Plaintiff] that I was not convinced that she wasn't diverting as there were multiple unexplained transactions and a large amount of missing medication.

Attached to this email was the language drafted by New that was included in Employer's referral of Plaintiff to TNPaP, which reiterated the above and further stated,

Prior to meeting with [Plaintiff], multiple controlled substance transactions were reviewed by Kim New, and additional undocumented doses were identified. . . . Kim New and Laura Harper reviewed these transactions together and it was agreed that diversion was likely. Laura Harper noted that [Plaintiff] had had a change in her behavior starting in the prior 6 months; a change that was significant enough to have caused her to ask Ms. New to review her transactions for possible diversion and to keep an eye on her transactions going forward. At that time a random review of the transactions by Ms. New failed to reveal anything suspicious, and it was noted that [Plaintiff] was not statistically significant for Class II and III controlled substances when compared to her peers. Laura Harper stated that [Plaintiff]

14

had lost a significant amount of weight in the past few months and was having financial issues resulting in impending garnishment of wages. [Plaintiff] was in advanced corrective action due to tardiness, and had actually been referred to EAP as a part of the corrective action process.

* * *

A drug screen was performed and then Kim New left after encouraging [Plaintiff] to confide in Laura Harper about what was going on. [Plaintiff] was informed by Kim that she was not convinced that she wasn't diverting, as there were multiple unexplained transactions and a large amount of missing medication.

* * *

Based on all the evidence, it was determined that there was overwhelming evidence that diversion had occurred and that [Plaintiff] would be terminated. [Plaintiff] met with Ms. Harper and Brenda Merhar (from HR) on August 30, and was terminated for gross misconduct retroactive to August 28.

Employer fired Plaintiff before her drug screen results came back. Plaintiff applied for unemployment benefits. Linda Wheeler, who worked for Employer in human resources, responded to the state's request for Plaintiff's separation information. Wheeler testified by affidavit as follows regarding her response:

When I received a questionnaire regarding [Plaintiff's] claim for unemployment compensation benefits I looked in the electronically maintained file regarding [Plaintiff] and saw a document that indicated a positive drug screen, and a termination letter which stated that she had been terminated for gross misconduct in violation of the Drug Free Workplace Policy. On the basis of those documents, I believed that [Plaintiff] had been discharged because of the positive drug screen, and I submitted those documents along with questionnaire answers to the Tennessee Department of Labor and Workforce Development.

* * *

15

I did not consult with Laura Harper or Brenda Merhar before submitting a response to the Tennessee Department of Labor and Workforce Development in response to [Plaintiff's] claim for unemployment compensation benefits. I put the response together based solely on the documents that I saw in the file.

I do not play a role in making discharge decisions. I was not consulted during the process that led to the discharge of [Plaintiff] from employment with the Hospital, and I have no personal knowledge of that decision-making process.

Plaintiff's drug screen was in fact positive for amphetamines, but this was because she had a valid prescription for, and was taking, medication for her ADHD. The test was negative for any other controlled substance. Employer eventually sent a letter to the Tennessee Department of Labor and Workforce Development explaining Wheeler's error:

[W]e want to correct a statement given in connection with the request for separation information. The previously provided narrative attachment referred to a drug screen result as a reason for discharge. That statement was made in error. The Claimant was not discharged on the basis of a drug screen result.

The UT Medical Center discharged the Claimant after an investigation led its Compliance Specialist to conclude that the Claimant had diverted medication. That is the sole reason for the discharge decision.

In evaluating Plaintiff's TDA claim for discriminatory discharge solely due to a perceived disability under Tenn. Code Ann. § 4-21-102(3)(A)(iii), we must return to the legislature's definition of "disability," which expressly "does not include *current*, illegal use of, *or addiction to*, a controlled substance." *Id.* 4-21-102(3)(B) (emphasis added). The evidence suggests that Employer had a concern that Plaintiff might have been addicted, which is a natural and reasonable concern regarding anyone suspected of diverting medication. But even acknowledging that concern, the point is that Plaintiff still would not have established that she met the statutory definition of having a disability. If an employer perceives, rightly or wrongly, that an employee has a *current active* addiction to a controlled substance, then it is not perceiving a "disability" under the TDA. There is no evidence, nor did Plaintiff allege, that Employer considered her to be a former, or presently recovering, drug addict. Consequently, Plaintiff was unable to

16

establish a prima facie case, and we affirm the trial court's summary judgment on this ground.[3] The United States District Court for the Middle District of Tennessee, applying the TDA, has recently reached a similar conclusion. *See Hannah v. United Parcel Service, Inc.*, No. 3-14-1774, 2014 WL 5810214, at *1-2 (M.D. Tenn., filed Nov. 7, 2014).

Alternatively, and additionally, we affirm on the trial court's stated ground that Plaintiff was unable to show that Employer's stated reason for the discharge – its suspicion that she was diverting medications – was pretextual. The burden-shifting paradigm at Tenn. Code Ann. § 4-21-311(e) is the familiar *McDonnell Douglas* framework applied to employment discrimination cases. *See Barnes*, 48 S.W.3d at 698; *Yount v. FedEx Express*, No. W2015-00389-COA-R3-CV, 2016 WL 1056958, at *7 (Tenn. Ct. App., filed Mar. 17, 2016) ("in light of the Tennessee Supreme Court's decision in *Rye* to overrule *Hannan*, we conclude that the *McDonnell Douglas* framework once again applies in Tennessee to analyze discrimination claims at the summary judgment stage."). In this case, there is no doubt that Employer provided a legitimate, nondiscriminatory reason for firing Plaintiff – its suspicion, supported by evidence unchallenged by Plaintiff, that she was diverting medications. The burden shifted back to Plaintiff to establish this reason was a pretext for illegal discrimination. Regarding the pretext analysis, we have observed:

> A plaintiff may establish pretext in one of three ways: by showing "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the employee's] discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir.1993)) (emphasis in *Manzer*).
>
> An employer's proffered reason for termination of an employee has no *basis in fact* if "the employer's proffered non-discriminatory reasons for [the employee's] demotion or discharge are factually false." *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123–24 (7th Cir.1994); see also *Manzer*, 29 F.3d at 1084 (citing *Baxter Healthcare*).

---

[3] The trial court did not grant summary judgment on this basis, probably because Employer rather broadly conceded that it was not arguing Plaintiff failed to establish a "disability" under the statute. Nonetheless, it is well established that we "may affirm the judgment on grounds different from those relied upon by the lower courts when the lower courts have reached the correct result." *In re Estate of Trigg*, 368 S.W.3d 483, 502 n.63 (Tenn. 2012).

The question is not whether the employer's decision was sound, but whether the employer's asserted reason for the adverse employment decision is pretextual. *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988). The reasonableness of an employer's decision may be considered, but only so far as it "illuminates the employer's motivations." *Id.* "The more questionable the employer's reason, the easier it will be for the jury to expose it as pretext." *Id.* Thus, on summary judgment, a non-moving plaintiff must "produce evidence from which a rational factfinder could infer that the company lied about its proffered reasons for [the employee's] dismissal." *Baxter Healthcare*, 13 F.3d at 1124 (internal quotations omitted).

In attempting to show that a defendant's proffered reason did not *actually* motivate discharge, a plaintiff may either (1) produce evidence that the adverse employment decision was more likely motivated by discrimination, or (2) show that the employer's explanation is not credible. *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342–43 (6th Cir.1997).

To show that a defendant's proffered reason is *insufficient* to motivate discharge, a plaintiff must produce "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084.

*Versa v. Policy Studies, Inc.*, 45 S.W.3d 575, 581 (Tenn. Ct. App. 2000) (italics and brackets in original).

In the instant case, the evidence is undisputed that, when Employer confronted Plaintiff with evidence supporting its suspicion that she had diverted medications, including data from its electronic medication monitoring systems, she provided no explanation. Even examining the proof in the light most favorable to Plaintiff, there is no evidence in the record that would reasonably support a conclusion that Employer's stated reason was pretextual and that its real, *sole* reason for firing Plaintiff was discriminatory. We therefore affirm the trial court's summary judgment in favor of Employer.

## IV.

The trial court's judgment is affirmed.  Costs on appeal are assessed to the appellant, Laura Lee Demastus, and the case is remanded for collection of costs below.


_____
CHARLES D. SUSANO, JR., JUDGE